**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| RICARDO BARBA, et al., | No. CV 09-1115-PHX-SRB |
| Plaintiffs, | |
| vs. | **ORDER** |
| SEUNG HEUN LEE (a/k/a Seung Huen Lee), et al. | |
| Defendants. | |

At issue are seven Motions to Dismiss filed by Defendants Seung Heun Lee (Doc. 38), Vortex, Inc. (Doc. 39), Dahn Yoga & Health Centers, Inc. and Mago Earth, Inc. jointly (Doc. 41), CGI, Inc. (Doc. 51), Journg Sook Lee (Doc. 61), Tao Fellowship (Doc. 65), and BR Consulting, Inc. and Oasis Arabians, LLC jointly (Doc. 67).  Also at issue are two Motions for Summary Judgment filed by Defendants Dahn Yoga & Health Centers, Inc. and Mago Earth, Inc. jointly (Docs. 18 & 102), and one Motion for Summary Judgment filed by Defendants Vortex, Inc., Tao Fellowship, BR Consulting, Inc., and Oasis Arabians, LLC jointly (Doc. 111).

**I.      BACKGROUND**

Twenty-seven individual Plaintiffs bring this action against two individual and seven corporate Defendants.  (Doc. 7, 1st Am. Compl. ("FAC") ¶¶ 3-38.)  The Plaintiffs reside in nine different states and the Republic of Korea.  Defendant Seung Heun Lee, also referred to as Ilchi Lee, ("Mr. Lee") is an individual residing in Arizona.  (*Id.* ¶ 30.)   His wife,

Defendant Journg Sook Lee, ("Mrs. Lee") resides in New Jersey. (*Id.* ¶ 31.) Plaintiffs allege that Mr. Lee is the "founder, leader and controller" of the seven corporate Defendants:  Dahn Yoga & Health Centers, Inc. and Mago Earth, Inc. ("DYHC")[1], Tao Fellowship ("Tao"), Vortex, Inc. ("Vortex"),  Oasis Arabians, LLC ("Oasis"),  BR Consulting, Inc. ("BR"), and CGI, Inc. ("CGI"). (*Id.* ¶ 39.)  Defendants DYHC, Tao, Vortex and Oasis are incorporated and have their principal place of business in Arizona. (*Id.* ¶¶ 32-33, 35-36, 38.)  Defendant BR is incorporated in New Jersey with its principal place of business in Arizona. (*Id.* ¶ 34.) Defendant CGI is incorporated and has its principal place of business in New Jersey. (*Id.* ¶ 37.)  Plaintiffs allege that Mrs. Lee controls CGI, "subject only to [Mr. Lee's] supervision." (*Id.* ¶ 52.)

Plaintiffs allege as follows:  Defendants operate more than 130 yoga centers in the United States.  (*Id.* ¶ 39.)  Defendants recruit members to the "Dahn organization" by operating yoga clubs on college campuses and through solicitation from existing members. (*Id.* ¶ 40.)  Defendants promise new members "improved physical and mental health and personal and spiritual growth" with the mission of promoting "world peace and health through the dissemination and globalization of Dahn Yoga practices." (*Id.* ¶ 41.) The "Dahn organization" is actually a "totalistic, high demand group" with Mr. Lee as its leader, and it engages in the "indoctrination, psychological manipulation, thought reform, coercive persuasion and undue influence" of its members. (*Id.* ¶ 42.)  "Under the guise of Dahn Yoga training," Defendants subject members to intense and prolonged physical and psychological programs designed to create in them "an absolute devotion" to Mr. Lee and his "Vision." (*Id.* ¶ 59f.)  Eventually, members are subjected to sleep deprivation, a low protein diet, excessive physical exertion and physical punishment, among other techniques, and members are encouraged to sever ties with their families and friends and are forbidden to have romantic

---

[1] According to their briefing, Defendant Mago Earth, Inc. merged with Defendant Dahn Yoga & Health Centers, Inc. in July 2007.  (Doc. 18, Dahn Defs.' Mot. to Dismiss, or in the Alternative, Mot. for Summ. J. ("MSJ 1"), Decl. of Nyun Haeng Kim ¶ 4.)  These two Defendants are hereinafter referred to jointly as "DYHC."

relationships. (*Id.* ¶ 74.) Through "coercive persuasion and undue influence," Defendants induce their members to "donate all the money they possess or can borrow" to the "Dahn organization." (*Id.* ¶ 44.) Defendants also induce their members to "work excessive hours assisting in the operation of the Dahn Yoga centers and other Dahn business operations without reasonable or lawful compensation." (*Id.*) Defendants "concealed the fact that Defendant [Mr. Lee] squeezes all of the profit from the operation of the Dahn organization and uses it to purchase luxurious ranches, houses, cars, horses and boats, as well as to fund his extravagant lifestyle of travel, fine dining, high-stakes gambling, hunting, deep sea fishing and golfing." (*Id.* ¶ 61.)

Plaintiffs assert that, "[h]ad they known the true facts about the Dahn organization, as set forth above, Plaintiffs would not have participated in any Dahn Yoga classes, programs or retreats." (*Id.* ¶ 62.) In essence, Plaintiffs all allege that they were fraudulently induced to become members of the "Dahn organization" and suffered damages as a result. (*Id.* ¶¶ 54, 97-159.) Plaintiffs now raise ten causes of action ("COAs") against Defendants:

COA 1:    All Plaintiffs allege Fraud in the Inducement against all Defendants.
COA 2:    All Plaintiffs allege Undue Influence against all Defendants.
COA 3:    Fourteen Plaintiffs allege violations of the Massachusetts Deceptive Trade Practices Act against all Defendants.
COA 4:    Two Plaintiffs allege violations of the Illinois Consumer Fraud Act against all Defendants.
COA 5:    One Plaintiff alleges violations of the Texas Deceptive Trade Practices Act against all Defendants.
COA 6:    All Plaintiffs allege Intentional Infliction of Emotional Distress against all Defendants.
COA 7:    All Plaintiffs allege Fair Labor Standards Act ("FLSA") violations against all Defendants.
COA 8:    All Plaintiffs allege Racketeer Influenced and Corrupt Organizations Act ("RICO") violations against all Defendants.
COA 9:    Plaintiff Ms. Harrelson alleges sexual assault against Mr. Lee as a claim of Intentional Infliction of Emotional Distress.
COA 10:   Plaintiff Ms. Harrelson alleges sexual assault against Mr. Lee as a claim of Negligent Infliction of Emotional Distress.

(*Id.* ¶¶ 97-159.) In seven Motions to Dismiss and three Motions for Summary Judgment, Defendants now move to dismiss all of Plaintiffs' claims.

## II.    LEGAL STANDARDS AND ANALYSIS

### A.    Sufficiency of the Complaint

1    The Federal Rules of Civil Procedure require "only 'a short and plain statement of

2 the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair

3 notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v.*

4 *Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957));

5 *see also* Fed. R. Civ. P. 8(a)(2). Thus, dismissal for insufficiency of a complaint is proper

6 if the complaint fails to state a claim on its face. *Lucas v. Bechtel Corp.*, 633 F.2d 757,

7 759 (9th Cir. 1980); *see also* Fed. R. Civ. P. 12(b)(6). "While a complaint attacked by a

8 Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to

9 provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and

10 conclusions, and a formulaic recitation of the elements of a cause of action will not do."

11 *Twombly*, 550 U.S. at 555 (citations omitted).

12    A Rule 12(b)(6) dismissal for failure to state a claim can be based on either (1) the

13 lack of a cognizable legal theory or (2) insufficient facts to support a cognizable legal

14 claim. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990); *Robertson*

15 *v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984). In determining whether

16 an asserted claim can be sustained, all allegations of material fact are taken as true and

17 construed in the light most favorable to the non-moving party. *Clegg v. Cult Awareness*

18 *Network*, 18 F.3d 752, 754 (9th Cir. 1994). "[A] well-pleaded complaint may proceed

19 even if it strikes a savvy judge that actual proof of those facts is improbable, and that

20 'recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v.*

21 *Rhodes*, 416 U.S. 232, 236 (1974)). However, "for a complaint to survive a motion to

22 dismiss, the non-conclusory 'factual content,' and reasonable inferences from that

23 content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v.*

24 *U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 129 S. Ct.

25 1937, 1952 (2009)). In other words, the complaint must contain enough factual content

26 "to raise a reasonable expectation that discovery will reveal evidence" of the claim.

27 *Twombly*, 550 U.S. at 556.

28

1    For claims involving fraud, Rule 9(b) imposes additional pleading requirements:

2  "In alleging fraud or mistake, a party must state with particularity the circumstances

3  constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a

4  person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  This heightened pleading

5  requirement

> serves not only to give notice to defendants of the specific fraudulent
> conduct against which they must defend, but also "to deter the filing of
> complaints as a pretext for the discovery of unknown wrongs, to protect
> [defendants] from the harm that comes from being subject to fraud charges,
> and to prohibit plaintiffs from unilaterally imposing upon the court, the
> parties and society enormous social and economic costs absent some factual
> basis."

10  *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) (quoting *In re Stac Elecs.*

11  *Secs. Litig*., 89 F.3d 1399, 1405 (9th Cir. 1996)).

12    To meet the Rule 9(b) particularity requirement,

> a plaintiff must set forth *more* than the neutral facts necessary to identify
> the transaction. The plaintiff must set forth what is false or misleading
> about a statement, and why it is false. In other words, the plaintiff must set
> forth an explanation as to why the statement or omission complained of was
> false or misleading.

16  *In re GlenFed, Inc. Secs. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc)*, superseded*

17  *by statute on other grounds*, Private Securities Litigation Reform Act of 1995, Public

18  Law 104-67 (codified at 15 U.S.C. § 78u-4 (1995)).  The falsity of the challenged

19  representation may be proven "by pointing to inconsistent contemporaneous statements

20  or information (such as internal reports) which were made by or available to the

21  defendants."  *Id*. at 1549.  The plaintiff "must include statements regarding the time,

22  place, and *nature* of the alleged fraudulent activities," and "'mere conclusory allegations

23  of fraud are insufficient.'"  *Id*. at 1548 (quoting *Moore v. Kayport Package Express, Inc*.,

24  885 F.2d 531, 540 (9th Cir. 1989)).  Under Arizona law, the elements of actionable fraud

25  are as follows:

> (1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's
> knowledge of its falsity or ignorance of its truth; (5) [the speaker's] intent
> that it should be acted upon by the person and in the manner reasonably
> contemplated; (6) the hearer's ignorance of its falsity; (7) [the hearer's]

reliance on its truth; (8) [the hearer's] right to rely thereon; (9) [the hearer's] consequent and proximate injury.

*Moore v. Meyers*, 253 P. 626, 628 (Ariz. 1927).

### 1.    Alter Ego, Agency and Conspiracy Liability

The Defendants first assert that dismissal of Plaintiffs' COAs 1-8 is appropriate because Plaintiffs fail to sufficiently allege the theories upon which those claims are based, namely, alter ego, agency and conspiracy. (*E.g.*, Mr. Lee Motion to Dismiss ("MTD") at 5-6; Tao MTD at 3-5; Vortex MTD at 3-5.)  In response, Plaintiffs argue that the FAC contains sufficient facts to support Plaintiffs' liability theories. (*E.g.*, Pls.' Opp'n to Mr. Lee MTD at 2-6.)

### a.    Alter Ego

Plaintiffs allege that "Defendant Ilchi Lee is the founder, leader and controller of the Dahn organization, and the principal of the corporate Defendants," and that "[a]ll of the corporate Defendants are Ilchi Lee's alter egos, subject to his absolute control and dominion." (FAC ¶ 39.)  In essence, Plaintiffs contend that they should be permitted to recover against Mr. Lee's personal assets for the actions of the Defendant corporations under the state law doctrine of piercing the corporate veil. (*E.g.*, Pls.' Opp'n to Mr. Lee MTD at 2-4; Pls.' Opp'n to CGI MTD at 3-5.)  In moving to dismiss, Defendants assert that there is no such thing as the "Dahn organization" and that Plaintiffs base their claims on the alter ego theory "[w]ith no factual allegations or basis." (*E.g.*, Mr. Lee MTD at 5-6; Tao MTD at 3-5; Vortex MTD at 3-5.)

Under Arizona law,[2]

---

[2] The FAC alleges that five of the seven corporate Defendants are incorporated under the laws of Arizona, and two–CGI and BR–are incorporated under the laws of New Jersey. (FAC ¶¶ 32-38.) Plaintiffs contend that New Jersey law regarding alter ego liability should apply to CGI because it is incorporated and has its principal place of business in New Jersey. (Pls.' Opp'n to CGI MTD at 3.) CGI appears to agree by citing New Jersey law in its Reply. (Reply to CGI MTD at 4.) On the other hand, Plaintiffs cite Arizona law regarding alter ego liability for BR. (Pls.' Opp'n to BR/Oasis MTD at 4.) Because New Jersey law does not appear to conflict with Arizona law with regard to alter ego liability between a corporate

[a]s a general rule, a corporation will be treated as a legal entity until sufficient reason appears to disregard the corporate form.  The corporate fiction will be disregarded when the corporation is the alter ego of a person, and when to observe the corporation would work an injustice.  The alter-ego status is said to exist when there is such unity of interest and ownership that the separate personalities of the corporation and owners cease to exist . . . . If there is no unification of interests and intermingling of funds, so that the corporation loses its separate identity, then the owners should not be personally liable.

*Dietel v. Day*, 492 P.2d 455, 457 (Ariz. App. 1972) (citations omitted).  Arizona courts consider various factors to determine whether the requisite unity of interest and ownership exists, such as commingling of personal and corporate funds and assets, failure to keep funds from various entities separate, and unauthorized diversion of corporate funds or assets for non-corporate purposes. *Ize Nantan Bagowa, Ltd. v. Scalia*, 577 P.2d 725, 729 n.4 (Ariz. Ct. App. 1978) (looking to California law in citing *Associated Vendors, Inc. v. Oakland Meat Co.*, 26 Cal. Rptr. 806, 813-14 (Cal. Ct. App. 1963)).  The doctrine of piercing the corporate veil is typically applied when a plaintiff seeks recovery against the assets of a corporate shareholder or director. *See Leo Eisenberg & Co. v. Payson*, 785 P.2d 49, 54 (Ariz. 1989).  But courts have, in certain instances where justice so required, applied the doctrine to reach a non-shareholder, non-director party with unity of interest and ownership to a tortfeasor. *See Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 1 Cal. Rptr. 2d 301, 318 (Cal. Ct. App. 1991).

In alleging alter ego liability under the pleading standard of Rule 8(a), the plaintiff must do more that make conclusory statements regarding an alter ego relationship

---

defendant and one of its principals or owners, the Court applies Arizona law here. *Compare Stochastic Decisions, Inc. v. DiDomenico*, 565 A.2d 1133, 1136 (N.J. Super. Ct. App. Div. 1989) (concluding that it was appropriate to pierce the corporate veil to reach individual owners where corporate defendants "commingled funds and operated in each others' names" and "made impermissible personal payments to their owners, the classic criteria [*sic*] for piercing the corporate veil"), *with Dietel v. Day*, 492 P.2d 455, 457 (Ariz. Ct. App. 1972); *see also Star Creations Inv. Co. v. Alan Amron Dev., Inc.*, No. Civ. A. 95-4328, 1995 WL 495126, at *12-15 (E.D. Pa. Aug. 18, 1995) (conducting a choice of alter ego law analysis between multiple states).

1  between individual and corporate defendants; the plaintiff must allege specific facts

2  supporting application of the alter ego doctrine. *Compare Skydive Ariz., Inc. v.*

3  *Quattrochi*, No. CV 05-2656-PHX-MHM, 2006 WL 2460595, at *7-8 (D. Ariz. Aug. 22,

4  2006) (finding plaintiff failed to state a claim against defendants where complaint simply

5  alleged the alter ego theory with no factual basis), *with Whitney v. Wurtz*, No. C-04-5232

6  PVT, 2006 WL 83119, at *2 (N.D. Cal. Jan. 11, 2006) (finding complaint established a

7  cognizable alter ego theory by alleging individual defendants "used assets of the

8  corporation for their personal use," "controlled, dominated and operated" corporation "as

9  their individual business and alter ego" without "holding of director's or shareholder's

10  meetings," and "caused monies to be withdrawn from the funds of defendant corporation

11  and distributed to themselves without any consideration to the corporation").

12      Plaintiffs point to ¶¶ 39 and 48-52 of the FAC to support their argument that they

13  have sufficiently pled the alter ego theory.  There, Plaintiffs allege in pertinent part:

14      Ilchi Lee used the funds, assets and employees of the corporate Defendants
        for his own purposes.  Ilchi Lee caused the funds, assets and employees of
15      the corporate Defendants to be transferred without adequate consideration.
        Ilchi Lee completely controlled, dominated, managed and operated each of
16      the corporate Defendants and intermingled the funds, assets and employees
        of each to suit his convenience.  The corporate Defendants share the same
17      officers and directors.  (FAC ¶ 48.)

18      The corporate Defendants are mere shells, without capital, assets, stock or
        stockholders. . . . The business of each of the Defendant corporations was
19      carried out without the holding of directors' or shareholders' meetings and
        no records or minutes of any corporate proceedings were maintained.  (FAC
20      ¶ 49.)

21      Ilchi Lee routinely appointed, transferred and demoted the leadership of the
        Dahn business enterprise without regard for corporate fiction. . . . Ilchi Lee
22      causes all of the profit of the Dahn enterprise to be transferred to him or
        utilized for his personal benefit.  (FAC ¶ 50.)
23
        Adherence to the fiction of the separate existence of the Defendant
24      corporations as entities distinct from each other or Defendant Ilchi Lee
        would permit an abuse of the corporate privilege and would sanction fraud
25      and promote injustice.  It would permit Ilchi Lee to avoid liability for
        misconduct he conspired to commit and committed through the
26      manipulation of corporate Defendants he controlled.  (FAC ¶ 51.)

27  Plaintiffs' factual allegations are more than conclusory statements that Mr. Lee and each

28  corporate Defendant have an alter ego relationship and that observation of the corporate

1  form would work an injustice.  Taking the facts alleged in the FAC as true, as the Court

2  must, Plaintiffs have pled a cognizable alter ego theory by alleging that Mr. Lee uses

3  corporate assets for his personal use, intermingles assets and employees between various

4  corporations, controls the corporations without holding director's or shareholder's

5  meetings, and causes transfers of corporate funds without adequate consideration.  *See*

6  *Whitney*, 2006 WL 83119, at *2.  If Plaintiffs' allegations are true, recognition of the

7  wrongful acts of each corporate Defendant "as those of [the] corporation only will

8  produce inequitable results."  *See Associated Vendors*, 26 Cal. Rptr. at 813.   Under the

9  *Twombly* pleading standard, Plaintiffs have alleged enough to raise a reasonable

10  expectation that discovery will produce evidence of an alter ego relationship between Mr.

11  Lee and the corporate Defendants.[3]  *See Maganallez v. Hilltop Lending Corp.*, 505 F.

12  Supp. 2d 594, 607-08 (N.D. Cal. 2007) (concluding plaintiffs alleged a sufficient factual

13  basis for alter ego liability by stating that defendant company "was inadequately

14  capitalized, failed to maintain corporate formalities and was designed to limit the

15  liability" of the individual defendant).

16      In response to CGI's Motion to Dismiss, Plaintiffs also contend that New Jersey

17  law allows "reverse piercing" of the corporate veil, such that the assets of all corporate

18  Defendants under one owner or principal are available to satisfy all of those Defendants'

19  liabilities.  (Pls.' Opp'n to CGI MTD at 4-5.)  In response to the other Defendants'

20  Motions to Dismiss, Plaintiffs do not cite Arizona law for this proposition, however, nor

21  do they address whether Arizona or New Jersey law should apply to a determination of

22

23  [3] Defendants ask the Court to rely on *Siverls-Dunham v. Lee*, No. 05 Civ. 7518(PKC), 2006
    WL 3298964 (S.D.N.Y. Nov. 13, 2006), a decision from another jurisdiction involving Mr.
24  Lee, to find that there is no overarching "Dahn organization." (*E.g.,* Vortex MTD at 4.)  The
    Court declines to do so because, in determining whether Plaintiffs have stated a claim that
25  survives a motion to dismiss, the Court must take as true the allegations in the FAC and
    construe them in the light most favorable to the Plaintiffs.  *See Clegg*, 18 F.3d at 754.  The
26  Court is not expressing a belief that Plaintiffs will ultimately be successful in proving an alter
    ego relationship; rather, the Court simply finds that Plaintiffs have met their pleading
27  obligations with regard to alter ego liability.
28

1   whether the Arizona and New Jersey corporate Defendants can essentially be alter egos of

2   each other through Mr. Lee.

3        Although Arizona courts do not appear to have explicitly applied the reverse

4   corporate veil piercing doctrine, federal bankruptcy courts applying Arizona law have

5   recognized the availability of the doctrine.  *See In re Destiny Enterprises, LLC*, No. 2-07-

6   bk-00542, 2008 WL 5047808, at *3 (Bankr. D. Ariz. July 14, 2008) (describing a claim to

7   recover from a corporate debtor's manager and his other entities through the doctrine of

8   reverse veil piercing); *In re Don's Making Money, LLP*, No. 99-07757-PHX-CGC, 2007

9   WL 2784351, at *3 (Bankr. D. Ariz. Sept. 24, 2007) (describing the difference between

10  pleading traditional corporate veil piercing and reverse veil piercing, where all of the

11  owner's corporations are alter egos of the owner, and piercing each corporate entity's veil

12  allows access to all corporate assets to satisfy the debt of the owner or any of his

13  corporate entities); *see also Towe Antique Ford Found. v. Internal Revenue Serv.*, 999

14  F.2d 1387, 1390-91 (9th Cir. 1993) (collecting reverse corporate veil piercing cases).

15  Federal courts applying New Jersey law have recognized the same doctrine.  *See LiButti*

16  *v. United States*, 107 F.3d 110, 119 (2d Cir. 1997) (recognizing application of reverse

17  corporate veil piercing doctrine in multiple jurisdictions and applying doctrine under New

18  Jersey law); *Portfolio Fin. Servicing Co. v. Sharemax.com, Inc.*, 334 F. Supp. 2d 620,

19  626-27 (D.N.J. 2004) (stating that corporate veil piercing doctrine can be both "straight-

20  forward or in reverse").  No conflict is apparent between Arizona and New Jersey law

21  regarding the reverse corporate veil piercing doctrine.

22       As in a direct corporate veil piercing case, courts will apply the doctrine in reverse

23  to reach the assets of an alter ego corporation to "prevent fraud, illegality, or injustice, or

24  when recognition of the corporate entity would defeat public policy or shield someone

25  from liability for a crime."  *Portfolio Fin. Servicing*, 334 F. Supp. 2d at 626 (quotation

26  omitted).  Courts find the doctrine particularly applicable when the owner or principal has

27  used multiple entities "to hide assets or secretly to conduct business" to avoid liability.

28

1  *See id.*  Courts can reach multiple corporate entities if they are all the alter egos of the

2  same owner or principal.  *See Don's Making Money*, 2007 WL 2784351, at *3.

3       As discussed previously, Plaintiffs sufficiently allege that all corporate Defendants

4  are the alter ego of Mr. Lee.  In pleading facts showing that Mr. Lee exercises complete

5  control over the corporate Defendants, fails to follow corporate formalities, and

6  intermingles corporate employees and funds, Plaintiffs assert that Mr. Lee is attempting

7  "to conceal and misrepresent his involvement in the ownership, management and

8  financial interest in the business activities" of the corporate Defendants.  (FAC ¶¶ 48-49.)

9  In other words, Plaintiffs allege that Mr. Lee uses the corporate Defendants "to avoid

10  liability for his misconduct."  (FAC ¶ 50.)  Making all reasonable inferences from the

11  facts the Plaintiffs have alleged, the Court finds that Plaintiffs have sufficiently pled both

12  the straight-forward and reverse corporate veil piercing doctrines.

13                    **b.    Agency**

14       The Plaintiffs also allege that "each Defendant was the agent of every other

15  Defendant, and in doing the things herein alleged was acting within the course and scope

16  of such agency and with the permission and consent of said co-Defendants."  (FAC ¶ 46.)

17  Defendant Mr. Lee contends that Plaintiffs' agency allegation is conclusory and therefore

18  insufficient under Rules 8(a) and 9(b).[4]  (Reply to Mr. Lee MTD at 6.)

19       In Arizona,[5] "to create an agency relationship, there must be a manifestation of

20  consent by the alleged principal to the alleged agent that the agent shall act on his behalf

21  and subject to his control and consent by the agent to act on behalf of the principal and

22  subject to his control."  *Dawson v. Withycombe*, 163 P.3d 1034, 1050 (Ariz. Ct. App.

23

24  [4] The Court notes that here, as in other sections of their motions, Defendants DYHC and CGI

25  make a nearly verbatim argument to that of Mr. Lee in the Replies to their own Motions to
   Dismiss.  In this instance, these Defendants all cite the same non-controlling case law from

26  the Districts of Maryland and South Carolina.  (*See* Reply to DYHC MTD at 7; Reply to CGI

27  MTD at 6.)

28  [5] Plaintiffs cite Arizona law, and Defendants cite no authority for agency liability.

1   2007).  The Ninth Circuit has distinguished between the pleading requirements for an

2   agency relationship in non-fraud based claims under Rule 8(a) and fraud based claims

3   under Rule 9(b).  Generally, "as a matter of law, allegations of agency, vicarious liability,

4   and/or *respondeat superior* are not required" in the complaint.  *Greenberg v. Sala*, 822

5   F.2d 882, 886 (9th Cir. 1987).  Thus, even if a plaintiff knows that a defendant did not

6   personally commit the wrongful act alleged, the plaintiff may allege that the defendant is

7   legally responsible for the act "without going into the theories which support the ultimate

8   fact."  *Id.*  However, for claims based on fraud, "a plaintiff must, at a minimum, 'identify

9   the role of each defendant in the alleged fraudulent scheme.'"  *Swartz v. KPMG LLP*, 476

10  F.3d 756, 765 (9th Cir. 2007) (per curiam) (quoting *Moore*, 885 F.2d at 541) (internal

11  brackets omitted).  The specificity requirement of Rule 9(b) thus applies when a plaintiff

12  pleads liability for fraud under an agency theory; the plaintiff must allege with

13  particularity how the agent and principal were involved in the fraud.  *Id.* at 764-65.

14         Here, Plaintiffs were not required to plead facts supporting the elements of agency

15  for their non-fraud based claims.  However, COA 1 (fraud in the inducement claim),

16  COAs 3-5 (state unfair business law claims), and COA 8 (civil RICO claim) are all based

17  in fraud and thus subject to the pleading standard of Rule 9(b).  *See S. Union Co. v. Sw.*

18  *Gas Corp.*, 165 F. Supp. 2d 1010, 1017-18 (D. Ariz. 2001) (fraud in the inducement

19  claim); *Genuity Solutions, Inc. v. Nortel Networks, Inc.*, No. 02 Civ. 7883(LAK), 2002

20  WL 31802321, at *1 (S.D.N.Y. Dec. 13, 2002) (Massachusetts Deceptive Trade Practices

21  Act claim); *Gallagher Corp. v. Mass. Mut. Life Ins. Co.*, 940 F. Supp. 176, 180 (N.D. Ill.

22  1996) (Illinois Consumer Fraud Act claim); *Berry v. Indianapolis Life Ins. Co.*, 608 F.

23  Supp. 2d 785, 800 (N.D. Tex. 2009) (Texas Deceptive Trade Practices Act claim);

24  *Moore*, 885 F.2d at 541 (civil RICO claim).  For these claims, Plaintiffs fall well short of

25  the requirements of Rule 9(b) in pleading an agency relationship between the various

26  Defendants.  While Plaintiffs do allege some facts supporting their assertion that Mr. Lee

27  exercises control over the corporate Defendants, Plaintiffs fail to allege specific facts

28  regarding how Mr. or Mrs. Lee and the corporate Defendants were involved in the

1   fraudulent activity or whether the corporate Defendants consented to commit fraudulent

2   acts on behalf of Mr. or Mrs. Lee or each other.  Plaintiffs' conclusory statements of an

3   agency relationship are not sufficient to meet the particularity requirements of Rule 9(b)

4   for their fraud based claims, COAs 1, 3-5 and 8.

5   ### c.    Civil Conspiracy

6       The Plaintiffs also attempt to plead conspiracy liability for their claims against all

7   Defendants and against Mr. and Mrs. Lee more specifically.  The FAC alleges:

8       At all times herein mentioned the Defendants and their agents knowingly
        and willingly conspired with each other to do the acts and things hereinafter
9       alleged.  The Defendants and their agents did the acts and things hereinafter
        alleged pursuant to and in furtherance of the conspiracy.  (FAC ¶ 47.)
10
        Defendant Journg Sook Lee is the wife of Defendant Ilchi Lee.  Defendant
11      Ilchi Lee has granted her control over the shell corporation Defendant CGI,
        Inc, subject only to his supervision.  Defendant Journg Sook Lee knowingly
12      and intentionally conspired to commit and committed the wrongful conduct
        alleged herein, including the wrongful conduct involving those Plaintiffs
13      that performed work for the shell corporation CGI, Inc., including Plaintiffs
        Chun Hwa Ha, Woo Seok Jang, Hun Kim and Seung Hee Lee.  (FAC ¶ 52.)
14
15  In moving to dismiss, Defendants Mr. and Mrs. Lee each argue that the FAC "fails to

    identify any of the individual defendants involved in the conspiracy specifically, and
16
    provides no explanation as to [Defendants'] role or participation in the alleged
17
    conspiracy." (*E.g.,* Reply to Mrs. Lee MTD at 9 (citing *Skydive Arizona*, 2006 WL
18
19  2460595, at *8).)  Defendants DYHC and CGI make the same argument.  (Reply to

20  DYHC MTD at 7-8; Reply to CGI MTD at 6.)

21      In Arizona,[6] "[t]o establish liability on the basis of conspiracy, a plaintiff must

22  show by clear and convincing evidence that the defendant and at least one other person

    agreed to accomplish an unlawful purpose or lawful purpose by unlawful means, and
23
    accomplish the underlying tort, which in turn caused damages." *Dawson*, 163 P.2d at
24
25  1053.  "There is a qualitative difference between proving an *agreement* to participate in a

26  tort, *i.e.*, a civil conspiracy, and proving knowing action that substantially aids another to

27  _____

28  [6]  Plaintiffs cite Arizona law, and Defendants cite no authority for conspiracy liability.

1   commit a tort." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local*

2   *No. 395 Pension Trust Fund*, 38 P.3d 12, 37 (Ariz. 2002).  Under Arizona law, "there is

3   no such thing as a civil action for conspiracy." *Tovrea Land & Cattle Co. v.*

4   *Linsenmeyer*, 412 P.2d 47, 63 (Ariz. 1966).  "The action is one for damages arising out of

5   the acts committed pursuant to the conspiracy." *Id.*

6          In pleading conspiracy liability, a plaintiff must at minimum allege some facts

7   showing the elements of a conspiracy, including the requisite agreement between

8   defendants.  *Hillis v. Heineman,* No. CV-09-73-PHX-DGC, 2009 WL 2222709, at *4 (D.

9   Ariz. July 23, 2009).  Furthermore, "Rule 9(b) imposes heightened pleading requirements

10  where the object of the conspiracy is fraudulent." *Swartz*, 476 F.3d at 765 (internal

11  quotation omitted).  Here, the Plaintiffs allege no facts showing that the Defendants

12  actually agreed with each other to commit tortious acts.  Instead, the FAC provides only

13  conclusory statements to that effect, which is insufficient under Rule 8(a).  *See Twombly*,

14  550 U.S. at 555; *see also Hillis,* 2009 WL 2222709, at *4 (dismissing civil conspiracy

15  claim because it alleges no facts showing agreement between defendants).  Moreover, the

16  Plaintiffs fail to allege specific facts regarding the roles of the individual Defendants in the

17  alleged conspiracy and thus do not meet the requirements of Rule 9(b) in pleading a

18  conspiracy to commit fraudulent acts.  *See Swartz*, 476 F.3d at 765; *see also Skydive Ariz.*,

19  2006 WL 2460595, at *8; *S. Union Co. v. Sw. Gas Corp.*, 165 F. Supp. 2d 1010, 1019-22

20  (D. Ariz. 2001).  For all of these reasons, the Plaintiffs fail to adequately plead liability

21  under a conspiracy theory.

22          **2.      Common Law Claims of Fraud in the Inducement, Undue
                      Influence and Intentional Infliction of Emotional Distress**

23

24              **a.      Choice of Tort Law**

25          To decide the common law claims of fraud in the inducement (COA 1), undue

26  influence (COA 2), and intentional infliction of emotional distress (COA 6), the Court will

27

28

1   ultimately be required to resolve which state's substantive law applies to these claims.[7]  In

2   their motions and responses, the parties provide a cursory and generalized choice of law

3   analysis, where the Defendants conclude that Arizona law should apply, and the Plaintiffs

4   conclude that each Plaintiff's home state law should apply to all common law claims of all

5   Plaintiffs against all Defendants. (*E.g.*, Mr. Lee MTD at 10-12; Vortex MTD at 7; Pls.'

6   Opp'n to DYHC MTD at 2-3.)  None of the parties' briefs provides the individualized

7   choice of law analysis required in a multi-plaintiff, multi-defendant, multi-tort case such as

8   this one.

9       A federal court sitting in diversity must apply "the forum state's choice of law rules

10  to determine the controlling substantive law." *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir.

11  2002) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  "Arizona

12  courts apply the principles of the Restatement (Second) of Conflict of Laws (1971) to

13  determine the controlling law for multistate torts." *Bates v. Super. Ct. of Ariz.*, 749 P.2d

14  1367, 1369 (Ariz. 1988).

15      The Restatement (Second) of Conflict of Laws (1971) ("Restatement") § 6

16  delineates the following general factors to consider when choosing the applicable rule of

17  law:

18      (a) the needs of the interstate and international systems,
        (b) the relevant policies of the forum,
19      (c) the relevant policies of other interested states and the relative interests of
        those states in the determination of the particular issue,
20      (d) the protection of justified expectations,
        (e) the basic policies underlying the particular field of law,
21      (f) certainty, predictability and uniformity of result, and
        (g) ease in the determination and application of the law to be applied.
22

23  Restatement § 6(2).  Restatement § 145 provides guidance for the application of the § 6

24  factors to tort claims.

25  _____

26  [7] Defendants do not move to dismiss Plaintiff Ms. Harrelson's common law claims of
    intentional infliction of emotional distress (COA 9) and negligent infliction of emotional
27  distress (COA 10) on the basis that Ms. Harrelson inadequately pled those claims, but instead
    contend that those claims are barred by the applicable statute of limitations.  The Court
28  therefore addresses COAs 9 and 10 in the Statute of Limitations discussion, below.

1

2

3

4

5

6

> Section 145 provides that courts are to resolve tort issues under the law of the state having the most significant relationship to both the occurrence and the parties with respect to any particular question.  Section 145(2) lists some of the contacts which are to be considered in determining the choice of law applicable to a given issue.  Those especially relevant contacts include:
> 1.    The place where the injury occurred;
> 2.    The place where the conduct causing the injury occurred;
> 3.    The domicile, residence, nationality, place of incorporation and place of business of the parties;
> 4.    The place where the relationship, if any, between the parties is centered.

7

*Bates*, 749 P.2d at 1370.

8

For personal injury claims, Restatement § 146 provides:

9

10

11

> In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to a particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

12

Restatement § 146.  "Personal injury" is defined as involving "either physical harm or

13

mental disturbance" that arises from "injury to oneself or to another." *Id.* cmt. b.

14

For claims involving fraud, Restatement § 148(1) provides:

15

16

17

18

19

> When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

20

Restatement § 148(1).

21

"Courts have long recognized that they are not bound to decide all issues under the

22

local law of a single State.  Each issue must receive separate consideration because of the

23

varying interests involved." *Keene Corp. v. Ins. Co. of N. Am.*, 597 F. Supp. 934, 941

24

(D.D.C. 1984) (citing Restatement § 145(1) cmt. d).  Furthermore, in cases involving

25

multiple plaintiffs from multiple jurisdictions, the choice of law must be made on an

26

individual plaintiff basis, even if the number of jurisdictions involved makes the choice of

27

law analysis burdensome. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985)

28

(noting that, in choosing substantive law, the constitutional requirement to decide which

- 16 -

1   state has the most significant contact with the claims "is not altered by the fact that it may

2   be more difficult or more burdensome to comply . . . because of the large number of

3   transactions which the State proposes to adjudicate and which have little connection with

4   the forum").  Likewise, in a case involving multiple defendants from multiple

5   jurisdictions, the court may be required to apply the law of different states to different

6   defendants.  *See Keene,* 597 F. Supp. at 937-41.

7          For example, in considering the claim of a plaintiff from Illinois against a defendant

8   from Arizona for acts occurring in both Illinois and Arizona, the Court must first decide if

9   there is a true conflict between the laws of Illinois and Arizona for the plaintiff's claim.

10  *See Waggoner v. Snow, Becker, Kroll, Klaris & Krauss*, 991 F.2d 1501, 1506 (9th Cir.

11  1993).  If so, the Court must apply the law of the state that has a significant contact or

12  aggregation of contacts to the particular claim of the particular Illinois plaintiff against the

13  particular Arizona defendant.  *See Bates*, 749 P.2d at 1370.  Changing any one of the

14  variables–plaintiff, defendant or claim–may change the state law applied.  The Court may

15  not group the various claims, various plaintiffs, and various defendants together to decide

16  to apply Arizona law *solely* as a matter of convenience; such arbitrariness is

17  constitutionally impermissible.  *See Phillips,* 472 U.S. at 821-23.

18         In the instant matter, the twenty-seven Plaintiffs reside in ten different jurisdictions,

19  and Plaintiffs assert generically that "[t]he majority of the ongoing psychological

20  manipulation and indoctrination occurred in the Plaintiffs' home states," even though most

21  Plaintiffs allegedly spent extended periods of time in Defendants' training programs in

22  Arizona.  (*See* FAC ¶¶ 3-29; Pls.' Opp'n to DYHC MTD at 3.)  The Defendants are

23  allegedly incorporated and have their principal places of business in two different states,

24  Arizona and New Jersey.  (FAC ¶¶ 30-38.)  And Plaintiffs allege three common law

25  torts–COAs 1, 2 and 6–against all Defendants.  (FAC ¶¶ 97-115, 130-32.)  Even if it is

26  assumed that the only jurisdictions with an interest in this litigation are Plaintiffs' home

27  jurisdictions (ten) and Defendants' home states (two), if each Defendant committed each

28

1   alleged tort (three) against each Plaintiff, as Plaintiffs allege, there are 60 individual choice

2   of law analyses that must be completed.

3          Any attempt by the Court to begin the cumbersome process of choosing the

4   substantive law to apply to the individual Plaintiffs' common law claims in this case

5   exposes the FAC's deficiencies in stating these claims.  To begin with, the Court cannot

6   apply the Restatement §§ 145 and 146 factors because the FAC fails to state where each

7   individual injury occurred–Plaintiff's home state, Arizona, or elsewhere–or where the

8   conduct causing each individual injury occurred–Defendant's home state, Plaintiff's home

9   state, or elsewhere.  Likewise, under Restatement § 148, the FAC fails to allege in what

10  state the alleged false statements were made, and if Plaintiffs' actions in reliance on those

11  statements took place in the same state or elsewhere.  Instead, the FAC alleges in

12  generalities that all Defendants caused injuries and made false statements to all Plaintiffs

13  in any number of states.  As a result, the Court cannot conduct any choice of law analysis

14  at this point.  As discussed below, Plaintiffs fail to sufficiently state their common law

15  claims as required by Rules 8(a) and 9(b) under any state's laws.

16          **b.      Statement of Common Law Claims**

17          Rule 8 requires that a complaint offer more than simply "an unadorned, the-

18  defendant-unlawfully-harmed-me accusation."  *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*,

19  550 U.S. at 555).  Even before the Supreme Court elaborated on the pleading requirements

20  in the recent *Twombly* and *Iqbal* decisions, a plaintiff was required to plead sufficient facts

21  to "give the defendant fair notice of what the . . . claim is and the grounds upon which it

22  rests."  *See Twombly*, 550 U.S. at 555 (quoting *Conley*, 355 U.S. at 47.)  In the instant

23  case, Plaintiffs patently fail to provide the individual Defendants with fair notice of their

24  claims and the grounds therefor.  For example, Plaintiffs allege:

25          Defendants' intentional conduct, including the concealment of the true
            nature of the Dahn organization and their intentions with respect to new
26          recruits such as Plaintiffs, and their psychological manipulation,
            indoctrination, thought reform, coercive persuasion and undue influence of
27          Plaintiffs, as set forth above, constitutes extreme and outrageous conduct
            that was not privileged.

28

1   (FAC ¶ 131 (alleging COA 6 for intentional infliction of emotional distress).)  But

2   contrary to Plaintiffs' indication that Defendants' actions are set forth elsewhere in the

3   FAC, Plaintiffs fail to offer anywhere in the FAC details regarding what any individual

4   Defendant did, let alone where or when.  Instead, Plaintiffs provide a summary of each

5   Plaintiff's involvement with unspecified Defendants over a period of years.  Plaintiffs then

6   allege that one or more Defendants, without specifying which Defendants,[8] committed any

7   number of acts against each Plaintiff, and the acts were conceived and perpetrated in an

8   unspecified place–Arizona, Plaintiff's home state, or elsewhere–at an unspecified time

9   within a range of years.  Plaintiffs expect Defendants, and this Court, to make the leap

10  from these bare, generalized facts to allegations against specific Defendants.  The leap is

11  too great.  The FAC fails to provide fair notice to individual Defendants of the Plaintiffs'

12  common law claims and thus fails to meet the requirements of Rule 8.  *See Twombly*, 550

13  U.S. at 557 (noting that a complaint does not suffice if it makes "naked assertions" devoid

14  of "further factual enhancement").

15      Furthermore, COA 1 (fraud in the inducement) is subject to the heightened pleading

16  requirements of Rule 9(b).  By failing to provide the role of any individual Defendant in

17  the alleged fraudulent schemes, or the time, place and content of the alleged

18  misrepresentations, Plaintiffs do not even begin to provide the particularity required for

19  their fraud-based claim to survive a motion to dismiss.  *See Swartz*, 476 F.3d at 764-65

20  (" . . . Rule 9(b) does not allow a complaint to merely lump multiple defendants together

21  but requires plaintiffs to differentiate their allegations when suing more than one defendant

22  and inform each defendant separately of the allegations surrounding his alleged

23  participation in the fraud.") (internal quotation omitted); *Moore*, 885 F.2d at 541 (noting

24  that allegations of fraud "must identify the time, place, and manner of each fraud plus the

25  role of each defendant in each scheme") (internal quotation omitted).

26

27

28  [8] Even if Plaintiffs sufficiently allege the liability of Mr. Lee under the doctrines of alter ego or agency, the liability must begin with the act of at least one of the Defendants.

As a result, Plaintiffs fail to state a claim for fraud in the inducement (COA 1), undue influence[9] (COA 2), and intentional infliction of emotional distress (COA 6).  The defects related to these claims are potentially curable, however, and the Plaintiffs may therefore amend their pleading.  *See Bly-Magee*, 236 F.3d at 1019.

### 3.    State Statutory Law Claims of Deceptive Trade Practices

In COA 3, fourteen Plaintiffs claim that all seven corporate Defendants and two individual Defendants violated the Massachusetts Deceptive Trade Practices Act, Mass. Gen. Laws ch. 93A, § 2 (2009), with "misrepresentations," "intentional concealment," "psychological manipulation," "indoctrination," and "undue influence."  (FAC ¶ 117.)  On the same basis, in COA 4, two Plaintiffs claim that all Defendants violated the Illinois Consumer Fraud Act, 815 Ill. Comp. Stat. 505/2 (2009).  (FAC ¶ 122.)  Likewise, in COA 5, one Plaintiff claims that all Defendants violated the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code Ann. § 17.46 (Vernon 2009).  (FAC ¶ 127.)

In moving to dismiss, the Defendants contend that Plaintiffs fail to plead that the alleged actions occurred in a business context or primarily and substantially in each of the three states in question as required by the statutes.  (*E.g.*, Mr. Lee MTD at 15-16; Vortex MTD at 10-11.)  Defendants further contend that the FAC again fails to allege any specific actions by individual Defendants in the three states in question and therefore fails to give the individual Defendants fair notice of Plaintiffs' claims.  (*E.g.*, Mr. Lee MTD at 14-16; Vortex MTD at 9-11.)   Defendants also argue that Plaintiffs fail to meet the particularity requirements of Rule 9(b) when pleading claims based in fraud or misrepresentation. (*E.g.,* Mr. Lee MTD at 16; Vortex MTD at 10-11.)

The Massachusetts Deceptive Trade Practices Act looks to the Federal Trade Commission Act in prohibiting "[u]nfair methods of competition and unfair or deceptive

---

[9] Arizona state courts have not recognized a separate cause of action for undue influence. As noted previously, however, the Court cannot choose the applicable substantive law at this point because the Plaintiffs fail to allege sufficient facts for the Court to conduct the choice of law analysis.

acts or practices in conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. "No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within [Massachusetts]." *Id.* § 11.  In other words, a judge must "determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within [Massachusetts]." *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 799 (Mass. 2003).  Furthermore, the acts complained of must not simply be perpetrated in "any commercial transaction whatsoever;" instead, the plaintiff and defendant must have a commercial relationship and must be "acting in a business context." *Lantner v. Carson*, 373 N.E.2d 973, 976 (Mass. 1978).  Thus, a dispute arising from an employment relationship is not covered under the Act.  *Linkage Corp. v. Trs. of Boston Univ.*, 679 N.E.2d 191, 207 & n.33 (Mass. 1997).

Claims under the Illinois and Texas statutes have similar requirements. Under the Illinois Consumer Fraud Act, the plaintiff must plead that the defendant is engaged in trade or commerce in Illinois and that the defendant is engaged in unfair or deceptive acts or practices in the conduct of that trade or commerce.  *See People ex rel. Hartigan v. All Am. Aluminum & Const. Co.*, 524 N.E.2d 1067, 1071 (Ill. App. Ct. 1988); *see also* 815 Ill. Comp. Stat. 505/2.  Under the Texas Deceptive Trade Practices Act, the plaintiff must show that (1) she is a consumer in Texas, where "consumer" is defined as "an individual, partnership, [or] corporation who seeks or acquires by purchase or lease, any goods or services;" (2) defendant committed a false, misleading or deceptive act, breached a warranty, or engaged in an unconscionable action under the Act, and (3) these actions caused plaintiff's actual damages.  *Brittan Commc'ns Int'l Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899, 907 (5th Cir. 2002) (citing *Brown v. Bank of Galveston, N. A.*, 963 S.W.2d 511, 513 (Tex. 1998)); *see also* Tex. Bus. & Com. Code Ann. § 17.45(4).  To qualify as a consumer under the Texas Act, the plaintiff must also show that the goods or services

1   purchased or leased form the basis of the complaint.  *Id.* (citing *Cameron v. Terrell &*
2   *Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex. 1981)).

3        The FAC does adequately plead certain elements of these state statutory claims.
4   Taking the Massachusetts statutory claim as an example, the FAC alleges that the
5   Massachusetts Plaintiffs purchased yoga classes in Massachusetts.  However, it also
6   alleges that Plaintiffs purchased numerous workshops and training programs that took
7   place outside of Massachusetts and that some Plaintiffs worked for, and thus had an
8   employment relationship with, the Dahn Yoga Centers.  (*E.g.*, FAC ¶ 54g (stating that
9   Plaintiff Harrelson purchased yoga classes in Massachusetts but also purchased numerous
10  training courses in Arizona and Korea and worked for the Dahn centers in Korea and
11  Massachusetts).)  Construing these facts in favor of Plaintiffs, it is plausible that the
12  Massachusetts Plaintiffs would ultimately be able to prove that the "center of gravity of
13  the circumstances" that give rise to Plaintiffs' claims is "primarily and substantially"
14  within Massachusetts as required under the Act, notwithstanding the numerous services
15  that took place outside Massachusetts.  Moreover, whether each Massachusetts Plaintiff
16  engaged with Defendants in a business context instead of an employment context is an
17  issue better addressed at summary judgment or at trial.  A similar analysis applies to the
18  Illinois and Texas Plaintiffs.

19       However, the FAC suffers the same deficiency in pleading the state statutory claims
20  as it does in pleading the common law claims.  Plaintiffs fail to adequately plead facts
21  regarding the individual Defendants' alleged unfair and deceptive acts as required by all
22  three state statutes.  Plaintiffs again lump all seven corporate and two individual
23  Defendants together and make vague, generalized assertions implying acts by unspecified
24  Defendants on the Plaintiffs as a whole, instead of identifying what individual Defendants
25  did to Plaintiffs in Massachusetts, Illinois or Texas.  The FAC therefore fails to give
26  Defendants fair notice of the specific state statutory claims as required by Rule 8(a).

27       Furthermore, to the extent that Plaintiffs' state statutory claims rest on
28  "misrepresentations" and "intentional concealment" by Defendants, the FAC again fails to

meet the particularity requirements of Rule 9(b) for fraud based claims.[10]  *See Genuity*,
2002 WL 31802321, at *1 (stating that fraud based claims under the Massachusetts
Deceptive Trade Practices Act must be meet pled to Rule 9(b) standard); *Gallagher*, 940
F. Supp. at 180 (stating that fraud based claims under the Illinois Consumer Fraud Act
claim "must be pled with specificity" and thus "must state the identity of the person
making the misrepresentation, the time, place, and content of the misrepresentation, and
the method by which the misrepresentation was communicated"); *Berry*, 608 F. Supp. 2d
at 800 (stating that claims alleging violations of the Texas Deceptive Trade Practices Act
"are subject to the requirements of Rule 9(b)").  For all of these reasons, Plaintiffs fail to
state a claim under the Massachusetts, Illinois and Texas deceptive trade practices statutes
(COAs 3-5), but Plaintiffs may amend their pleading.  *See Bly-Magee*, 236 F.3d at 1019.

### 4.    Fair Labor Standards Act Claim

In COA 7, all Plaintiffs claim that all Defendants failed to pay wages and overtime
in violation of the Federal Labor Standards Act of 1983 ("FLSA"), 29 U.S.C. §§ 203, 206-
07, 216 (2009).  (FAC ¶¶ 134-39.)  In their Motions to Dismiss, Defendants argue that
Plaintiffs fail to plead facts showing an employee-employer relationship as required by the
FLSA, and, indeed, that Plaintiffs fail to allege which Plaintiffs even worked for which
Defendants.  (*E.g.*, Mr. Lee MTD at 18; DYHC MTD at 22.)  In response, Plaintiffs
contend that Mr. Lee is an employer under the FLSA because he oversaw the entire
alleged "Dahn organization," and Defendants are all employers under the FLSA as "joint
employers" under 29 C.F.R. § 791.2(b)(3) based on Plaintiffs' theories of alter ego and
conspiracy.  (*E.g.*, Pls.' Opp'n to Mr. Lee MTD at 17-19; Pls.' Opp'n to DYHC MTD at
17; Pls.' Opp'n to Vortex MTD at 15.)  Defendant DYHC also argues that Plaintiffs
worked as volunteers and are thus not employees under the FLSA, and, because Plaintiffs

---

[10] To the extent that the state statutory claims are not based in fraud, they do not need to be
pled with specificity. *E.g.*, *Declude, Inc. v. Perry*, 593 F. Supp. 2d 290, 296 (D. Mass. 2008);
*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663,
670 (7th Cir. 2008).

1  assert that they were defrauded into doing work for Defendants, Plaintiffs must plead their

2  claim with particularity under Rule 9(b).  (DYHC MTD at 22.)  Plaintiffs respond that

3  their FLSA claim is based on Defendants' failure to pay minimum wage and overtime, and

4  not Defendants' alleged fraudulent misrepresentations causing Plaintiffs to work as

5  volunteers for Defendants.  (Pls.' Opp'n to DYHC MTD at 18.)

6        The FLSA requires employers to pay a minimum wage and specified rates for

7  overtime work, and it provides a right of action to an employee to recover damages from

8  an employer who fails to meet the pay requirements.  29 U.S.C. §§ 206, 207 & 216.  An

9  action under the FLSA requires an employee-employer relationship, which is determined

10 based on the "economic reality" of the employment situation.  *Gilbreath v. Cutter

11 *Biological, Inc.*, 931 F.2d 1320, 1324 (9th Cir. 1991) (quoting *Goldberg v. Whitaker

12 *House Coop.*, 366 U.S. 28, 33 (1961)).  In determining whether an employee-employer

13 relationship exists, courts are to consider

> whether the alleged employer (1) had the power to hire and fire the
> employees, (2) supervised and controlled employee work schedules or
> conditions of employment, (3) determined the rate and method of payment,
> and (4) maintained employment records.

*Id.*  A volunteer for a government agency is not considered an "employee" under the

FLSA.  29 U.S.C. § 203(e)(4)(A).

      An FLSA claim is generally subject to the notice pleading requirements of Rule

8(a).  *See Vega v. Peninsula Household Servs., Inc.*, No. C-08-03815 JCS, 2009 WL

656291, at *3 (N.D. Cal. Mar. 12, 2009).  If, as DYHC argues, the Plaintiffs are asserting

that they only agreed to do work for Defendants as a result of Defendants'

misrepresentations, then only the averment of fraud need be pled with particularity under

Rule 9(b).  *See Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1104 (9th Cir. 2003).

      The FAC adequately alleges some facts supporting the FLSA claim by laying out

Plaintiffs' work histories and stating that Plaintiffs were not paid for their work.  An

examination of whether Plaintiffs are employees as defined by the FLSA must be left for

summary judgment or trial.[11]  However, the FAC fails to state for which Defendant or Defendants the Plaintiffs actually did work, and thus again fails to provide fair notice to Defendants.  For example, Plaintiffs allege that " . . . Ms. Miller began working full-time for Dahn assisting in the operation of Dahn centers in the Boston area."  (FAC ¶ 54o.)[12] The FAC then alleges that "Plaintiffs were employees of Defendants, and each of them, during the period in which they assisted in the operation of Dahn Yoga centers and other Dahn business operations."  (FAC ¶ 134.)  But Plaintiffs fail to allege from which Defendant employer the liability of all seven corporate and two individual Defendants arises.

In their briefing, Plaintiffs cite a non-controlling, pre-*Twombly* case for the proposition that, "when multiple defendants are named in a complaint, the allegations can be and usually are read in such a way that each defendant is having the allegation made about him individually." *Morrow v. Green Tree Servicing, L.L.C.*, 360 F. Supp. 2d 1246, 1249 (M.D. Ala. 2005) (quoting *Crowe v. Coleman*, 113 F.3d 1536, 1539 (11th Cir. 1997)) (quotation corrected).  But in that case, the plaintiff pled that all three defendants were her employers, and the court found that allegation sufficient to survive a motion to dismiss. Plaintiffs here allege that one or more unnamed Defendants, referred to as "Dahn," employed Plaintiffs, and the other Defendants are liable under theories of alter ego and conspiracy.  (*See* Pls.' Opp'n to Vortex MTD at 15.)  As stated previously, Plaintiffs do sufficiently allege their alter ego theory, but employer liability must still begin with the

---

[11] The Court notes that Plaintiffs do not allege that they did work for a government agency, so the assertion by DYHC that Plaintiffs are not covered by the FLSA because they were government agency volunteers as defined by the FLSA cannot be gleaned from the pleadings.

[12] In certain isolated instances, the FAC provides more detail regarding employment, such as, "In June of 2007, Ms. Morehouse moved back to New York and was transferred to work for BR Consulting."  (FAC ¶ 54q.) However, the vast majority of allegations do not identify a specific Defendant employer, and allegations that Defendants did not pay minimum wage or overtime are generalized for all Plaintiffs against all Defendants at all times.  (*See* FAC ¶¶ 137-38.)

1   Defendant or Defendants for whom Plaintiffs actually worked.  Thus, to provide fair

2   notice, Plaintiffs must state facts indicating against which Defendants their claim arises.

3   By failing to do so, the Plaintiffs' claim against all Defendants does not rise to the

4   "plausible" level as required by *Twombly*, and Plaintiffs again fail to meet the

5   requirements of Rule 8(a).  *See Twombly*, 550 U.S. at 556.  Plaintiffs' FLSA claim (COA

6   7) must therefore be dismissed, but Plaintiffs may amend their pleading.  *See Bly-Magee*,

7   236 F.3d at 1019.

8                          **5.      Civil RICO Claim**

9          In COA 8, all Plaintiffs claim that all Defendants formed an enterprise that violated

10  the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-

11  1968 (2009).  (FAC ¶¶ 141-48.)  Among the many arguments in their Motions to Dismiss,

12  the Defendants contend that Plaintiffs fail to allege the fraud based predicate acts with the

13  particularity required by Rule 9(b).  (*E.g.*, Mr. Lee MTD at 19; Vortex MTD at 13-14.)

14  Defendants also argue that Plaintiffs inadequately allege a "racketeering enterprise" as

15  required by RICO.[13]  (*E.g.*, Mr. Lee MTD at 20-21.)  To the extent that Plaintiffs' claim is

16  based on violations of wage and hour laws, Defendants repeat their contention that

17  Plaintiffs fail to allege sufficient facts showing an employee-employer relationship.  (*E.g.*,

18  Mr. Lee MTD at 20; Tao MTD at 11.)  Defendants further contend that Plaintiffs' civil

19  RICO claim based on violations of federal wage and hour laws is preempted by Plaintiffs'

20  FLSA claim.  (*E.g.*, Tao MTD at 11; Vortex MTD at 14.)  Finally, Defendants argue that

21  there is an insufficient connection between the alleged predicate acts and the damages

22  allegedly sustained by Plaintiffs.  (*E.g.*, Mr. Lee MTD at 20; Tao MTD at 11.)

23

24

_____

25  [13] DYHC also argues that Plaintiffs' allegation of alter ego liability is fatal to showing an

26  "enterprise" in their civil RICO claim, (*see* DYHC MTD at 23-24), but courts have

27  consistently concluded the opposite. *See, e.g.*, *Loma Linda Univ. Med. Ctr., Inc. v. Farmers Group*, No. CIV-S-94-0681WBS/JFM, 1995 WL 363441, at *8 n.5 (E.D. Cal. May 15,

28  1995).

1     A civil RICO violation "requires (1) conduct (2) of an enterprise (3) through a

2 pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496

3 (1985).  RICO lists the predicate acts that may constitute racketeering activity.  *Id.* at 497;

4 *see also* 18 U.S.C. § 1961.  The plaintiff must also prove that the defendant's racketeering

5 acts proximately caused plaintiff's injuries.  *Id.* at 496.  To survive a motion to dismiss, the

6 plaintiff must allege sufficient facts showing each of the elements of a civil RICO

7 violation.  *Id.*

8     The FAC alleges that all Defendants formed a racketeering enterprise that

9 committed certain predicate acts as defined in 18 U.S.C. § 1961, namely, fraud against all

10 Plaintiffs, (FAC ¶ 145a), fraud in the procurement of immigration documents for Korean

11 Plaintiffs, (FAC ¶ 145b), peonage of Korean Plaintiffs, (FAC ¶ 145c), wage and hour

12 violations against all Plaintiffs, (FAC ¶ 145d, e, f, g), and immigration violations related to

13 Korean Plaintiffs, (FAC ¶ 145h, i).  As discussed previously, Plaintiffs fail completely to

14 plead the fraud based acts with the particularity required by Rule 9(b).  *See Moore*, 885

15 F.2d at 541.  Also as discussed previously, Plaintiffs do not allege sufficient facts to show

16 the specific employee-employer relationships upon which their allegations of wage and

17 hour violations rest.[14]  Moreover, Plaintiffs' assertions of immigration violations do not

18 identify the sections of the Immigration and Nationality Act (or any another Act) that

19 Defendants allegedly violated.  (*See* FAC ¶ 145 h, i.)  These predicate acts must therefore

20 be excluded from the Court's consideration of the sufficiency of the civil RICO claim,

21 leaving only the allegation of peonage related to the Korean Plaintiffs as a predicate act for

22 the claim.  Because § 1961(5) of the RICO statute defines a "pattern of racketeering

23 activity" as requiring "at least two acts of racketeering activity," Plaintiffs fail to state a

24 ───────────────

25 [14] To the extent that Plaintiffs' civil RICO claim is based on their claim under the FLSA, the
RICO claim is likely preempted by the FLSA.  *See Williamson v. Gen. Dynamics Corp.*, 208
26 F.3d 1144, 1154 ("Claims that are directly covered by the FLSA (such as overtime and
retaliation disputes) must be brought under the FLSA."); *see also Choimbol v. Fairfield*
27 *Resorts, Inc.*, No. 2:05cv463, 2006 WL 2631791, at *7 (E.D. Va. Sept. 11, 2006) (concluding
28 that the FLSA preempts RICO claims alleged on the same basis).

1 civil RICO claim (COA 8).[15]  *See Sedima*, 473 U.S. at 497 n.14; *see also United Energy*

2 *Owners Comm., Inc. v. U.S. Energy Mgmt. Sys., Inc.*, 837 F.2d 356, 360-61 (9th Cir.

3 1988).  Because these pleading defects are potentially curable, Plaintiffs may amend their

4 Complaint.  *See Bly-Magee*, 236 F.3d at 1019.

**B.     Personal Jurisdiction**

6        Defendants CGI, a New Jersey corporation, and its alleged owner and president,

7 Mrs. Lee, both move the Court for dismissal for lack of personal jurisdiction pursuant to

8 Rule 12(b)(2) of the Federal Rules of Civil Procedure.  (*See* CGI MTD at 6-11; Mrs. Lee

9 MTD at 3-8.) Although Plaintiffs have failed to adequately state a claim against either

10 Defendant, Plaintiffs may amend their pleading, so the Court now addresses whether

11 Plaintiffs have shown sufficient facts supporting personal jurisdiction over CGI and Mrs.

12 Lee.

13       In order for a federal court to adjudicate a matter, it must have jurisdiction over the

14 parties.  *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982).

15 The party bringing the action has the burden of establishing that personal jurisdiction

16 exists.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citing

17 *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182-183 (1936)); *Data Disc, Inc.*

18 *v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977).  When a defendant moves,

19 prior to trial, to dismiss a complaint for lack of personal jurisdiction, the plaintiff must

20 "'come forward with facts, by affidavit or otherwise, supporting personal jurisdiction.'"

21 *Scott v. Breeland*, 792 F.2d 925, 927 (9th Cir. 1986) (quoting *Amba Mktg. Sys., Inc. v.*

22 *Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)).

23       Because there is no statutory method for resolving the question of personal

24 jurisdiction, "the mode of determination is left to the trial court." *Data Disc,* 557 F.2d at

25 1285 (citing *Gibbs v. Buck*, 307 U.S. 66, 71-72 (1939)).  Where, as here, a court resolves

26

27 [15] Considering these deficiencies in stating a civil RICO claim, the Court cannot determine at this point if Plaintiffs sufficiently alleged a "racketeering enterprise" or whether Plaintiffs'
28 injuries were proximately caused by Defendants' racketeering activities.

the question of personal jurisdiction using motions and supporting affidavits, the plaintiff "must make only a prima facie showing of jurisdictional facts through the submitted materials in order to avoid a defendant's motion to dismiss." *Id.* In determining whether the plaintiff has met that burden, the "'uncontroverted allegations in [the plaintiff's] complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists.'" *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002) (quoting *Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996)).

To establish personal jurisdiction over a nonresident defendant, a plaintiff must show that the forum state's long-arm statute confers jurisdiction over the defendant and that the exercise of jurisdiction comports with constitutional principles of due process. *Id.*; *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 269 (9th Cir. 1995). Arizona's long-arm statute allows the exercise of personal jurisdiction to the same extent as the U.S. Constitution. *See* Ariz. R. Civ. Proc. 4.2(a); *Cybersell v. Cybersell*, 130 F.3d 414, 416 (9th Cir. 1997); *A. Uberti & C. v. Leonardo*, 892 P.2d 1354, 1358 (Ariz. 1995) (stating that under Rule 4.2(a), "Arizona will exert personal jurisdiction over a nonresident litigant to the maximum extent allowed by the federal constitution"). Thus, a court in Arizona may exercise personal jurisdiction over a nonresident defendant so long as doing so accords with constitutional principles of due process. *Cybersell*, 130 F.3d at 416. Due process requires that a nonresident defendant have sufficient minimum contacts with the forum state so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *see also Data Disc,* 557 F.2d at 1287.

## 1.    Facts Supporting Personal Jurisdiction Over CGI

With regard to the Court's personal jurisdiction over CGI, Plaintiffs assert that they have made a prima facie showing of jurisdictional facts by sufficiently alleging in the FAC that CGI is Mr. Lee's alter ego. (Pls.' Opp'n to CGI MTD at 10-11.) Because the Court

1  has personal jurisdiction over Mr. Lee, who is a resident of Arizona, Plaintiffs contend that

2  the Court also has personal jurisdiction over CGI.  (*Id.* at 11.)

3        The Ninth Circuit has held that if a plaintiff shows that a defendant corporation is

4  the alter ego of an individual defendant such that the corporate form may be disregarded,

5  then a finding of personal jurisdiction over one supports a finding of personal jurisdiction

6  over the other.  *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1393-94 (9th Cir. 1984)

7  (concluding that the California court had personal jurisdiction over two individual

8  defendants from New York, and therefore also had personal jurisdiction over thirteen

9  corporations and partnerships from New York that were the alter egos of the two

10  individual defendants but otherwise had no ties to California); *see also Harris Rutsky &*

11  *Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134 (9th Cir. 2003) (noting

12  that, for purposes of personal jurisdiction, "a subsidiary's contacts may be imputed to the

13  parent where the subsidiary is the parent's alter ego"); *Patin v. Thoroughbred Power Boats*

14  *Inc.*, 294 F.3d 640, 653 & n.18 (5th Cir. 2002) (collecting cases) ("[F]ederal courts have

15  consistently acknowledged that it is compatible with due process for a court to exercise

16  personal jurisdiction over an individual or a corporation that would not ordinarily be

17  subject to personal jurisdiction in that court when the individual or corporation is an alter

18  ego or successor of a corporation that would be subject to personal jurisdiction in that

19  court.").  As noted earlier, the FAC alleges sufficient facts regarding alter ego liability

20  between CGI and Mr. Lee to survive the Motions to Dismiss.  Because the Court has

21  personal jurisdiction over Mr. Lee, Plaintiffs also make a prima facie factual showing of

22  personal jurisdiction over CGI.[16]

23              **2.     Facts Supporting Personal Jurisdiction Over Mrs. Lee**

24

25  _____

26  [16] Plaintiffs also argue that they have alleged sufficient jurisdictional facts with respect to
CGI through their conspiracy and civil RICO claims. (Pls.' Opp'n to CGI MTD at 9, 11-12.)
27  However, as discussed previously, the FAC fails to sufficiently plead these claims, and
Plaintiffs do not provide further allegations by way of affidavits in support of these
28  jurisdictional theories in their briefing.

1    In their briefing, Plaintiffs contend that CGI is also the alter ego of Mrs. Lee.  (Pls.'

2  Opp'n to Mrs. Lee MTD at 7.)  Plaintiffs therefore argue that, under *Flynt*, the Court's

3  personal jurisdiction over CGI results in personal jurisdiction over Mrs. Lee.  (*Id.* at 6-9.)

4  While Plaintiffs do not adequately plead alter ego liability between CGI and Mrs. Lee in

5  the FAC, they provide an affidavit with their briefing that supports their alter ego theory in

6  an effort to make a prima facie showing of jurisdictional facts with respect to Mrs. Lee.[17]

7    As the Ninth Circuit noted in *Flynt*, Plaintiffs are "only required to make a prima

8  facie showing of the alter ego relationship" to meet their burden of showing personal

9  jurisdiction as set forth in *Data Disc*.  *See Flynt*, 734 F.2d at 1393.  Because CGI is

10  incorporated and has its principal place of business in New Jersey and Mrs. Lee is a New

11  Jersey resident, the Court applies New Jersey law here to determine if Mrs. Lee and CGI

12  are alter egos such that the corporate veil should be pierced.  As in Arizona, "[t]he power

13  of New Jersey courts to pierce the corporate veil is well established."  *Stochastic*

14  *Decisions*, 565 A.2d at 1136 (citing *State Dept. of Envtl. Prot. v. Ventron*, 468 A.2d 150

15  (N.J. 1983)).  "The purpose of the doctrine of piercing the corporate veil is to prevent an

16  independent corporation from being used to defeat the ends of justice, to perpetrate fraud,

17  to accomplish a crime, or otherwise evade the law."  *Ventron*, 468 A.2d at 164 (citations

18  omitted).  While piercing the corporate veil most often arises in the context of a parent

19  corporation and its subsidiary, New Jersey courts will also pierce the veil between a

20  corporation and one of its owners when justice so requires.  *Stochastic Decisions*, 565

21  A.2d at 1136.  When deciding whether to impose liability on the owner of a defendant

22  corporation, New Jersey courts consider a number of factors, including whether the owner

23  has commingled funds between several corporate defendants and operated them without

24  _____

25  [17] The Court considers the affidavit for a showing of personal jurisdiction only, and notes that
the affidavit does not serve to state claims against Mrs. Lee.  *See Data Disc*, 557 F.2d at

26  1285.  Mrs. Lee's argument that Plaintiffs exceed the page limit in their Response on account
of the attached affidavit is cavil.  (*See* Reply to Mrs. Lee MTD at 1.)  Local Rule 7.2(e)

27  provides for a limit of 17 pages "exclusive of attachments," and the affidavit is clearly an

28  attachment.

1    regard to their corporate independence, and whether a corporate defendant made

2    impermissible personal payments to the owner, "the classic criteria [*sic*] for piercing the

3    corporate veil." *Id.*   Courts also consider whether the owner abused the corporate form to

4    use his or her businesses as "personal business conduits." *Walensky v. Jonathan Royce*

5    *Int'l, Inc.*, 624 A.2d 613, 617 (N.J. Super. Ct. App. Div. 1993).

6         In support of their jurisdictional showing, Plaintiffs provide the affidavit of Chun

7    Hwa Ha, who avers that she worked as Mrs. Lee's personal assistant at Mrs. Lee's

8    residence and also at CGI in the accounting department and on the "legal team."  (Pls.'

9    Opp'n to Mrs. Lee MTD, Ha Decl. ¶ 17.)  Ms. Ha states the following:   Mrs. Lee "was the

10   President and owner of CGI."  (*Id.* ¶ 22.)  CGI employees also worked "as personal

11   assistants to Mrs. Lee and maintained the real properties which she owned."  (*Id.* ¶ 23.)

12   Mrs. Lee housed CGI employees at her residence and was paid rent of $7,000 per month

13   by CGI.  (*Id.*)  CGI also paid "leases on a Mercedes and a Porsche used by Mrs. Lee."

14   (*Id.*)  In addition to the salary of $5,000 per month that Mrs. Lee received from CGI, she

15   also received $36,000 per month from co-Defendant BR, an Arizona corporation.  (*Id.*)

16   BR earned its revenue "under the name of consulting fee" from payments consisting of 30

17   percent of the gross income, or "Vision," from each of co-Defendant DYHC's centers, as

18   well as between $40,000 and $50,000 per month from CGI.  (*Id.* ¶ 21.)

19        Ms. Ha further alleges as follows: Employees ("Dahn Masters") were transferred

20   freely between Defendants CGI, DYHC, Tao and BR.  (*Id.* ¶ 25.)  By way of example,

21   Plaintiffs Woo Seok Jang and Seung Hee Lee had visas through DYHC, worked at CGI

22   and were paid through the personal checking accounts of individual Korean employees.

23   (*Id.*)  Most of the Defendants' corporate officers "are not working as their title suggests,"

24   but rather were listed as officers to maintain their immigration status.  (*Id.* ¶ 29.)  By way

25   of example, the "CEO" of Defendant Tao, Kyung Ryun Kim, actually worked at Honor's

26   Haven Resort, a resort and hotel operated by CGI in upstate New York, "helping Mrs.

27   Lee."  (*Id.*)  "He does not participate in any business involving Tao Fellowship, which is

28   located in Mago Garden, Sedona, Arizona."  (*Id.*)

1    In an effort to refute Plaintiffs' jurisdictional showing, Mrs. Lee provides her own

2 affidavit, wherein she states, "My only connection to the State of Arizona is the fact that

3 my husband [Defendant Mr. Lee] lives in Arizona."  (Mrs. Lee MTD, Mrs. Lee Decl. ¶ 6.)

4  She also states, "I do not live in Arizona, do not earn income or conduct business

5 activities in Arizona, and otherwise have no presence in Arizona." (*Id.* ¶ 5.)

6    Mrs. Lee does not attempt to refute the allegations of Ms. Ha.  Thus, although the

7 Court must resolve factual conflicts in Plaintiffs' favor in deciding whether Plaintiffs make

8 a prima facie case for personal jurisdiction, no real conflicts exist here.  *See Rio Props.*,

9 284 F.3d at 1019.  Plaintiffs provide evidence that funds were commingled between

10 Defendants DYHC, CGI and BR.  Further, by alleging that employees were freely

11 transferred between Defendant corporations and, in some cases, listed as officers of one

12 corporation when actually working for another corporation, Plaintiffs provide evidence

13 that Defendant corporations were operated without regard for their independence.

14 Plaintiffs also provide evidence that funds were diverted from CGI for Mrs. Lee's personal

15 uses.  Finally, Plaintiffs make a showing that Mrs. Lee used CGI as her "personal business

16 conduit," using employees as her personal assistants and housing employees at her

17 residence.  Under New Jersey law, the Court finds that Plaintiffs have made a prima facie

18 showing of an alter ego relationship between CGI and Mrs. Lee.  *See Stochastic Decisions*,

19 565 A.2d at 1136; *Walensky*, 624 A.2d at 617.  Thus, on account of the Court's personal

20 jurisdiction over CGI, Plaintiffs have also made a prima facie showing of personal

21 jurisdiction over Mrs. Lee.  *See Flynt*, 734 F.2d at 1393; *Data Disc*, 557 F.2d at 1285.

22    Because the Court finds that Plaintiffs make a prima facie showing of personal

23 jurisdiction over Mrs. Lee through the alter ego doctrine, the Court need not reach the

24 Plaintiffs' civil RICO and conspiracy theories of personal jurisdiction, Plaintiffs' effort to

25 show that Mrs. Lee has sufficient personal contacts with Arizona, or Plaintiff's theory that

26 Mrs. Lee is personally liable for torts that she authorized notwithstanding that she acted as

27 an agent of CGI.  (*See* Pls.' Opp'n to Mrs. Lee MTD at 3-6, 9-10.)  Plaintiffs' request for

28 jurisdictional discovery is likewise moot.  (*See id.* at 10-11.)

1      **C.     Service of Process**

2          Mrs. Lee also argues that she was not validly served with the summons and

3  complaint in this action, because the process server left a copy of the summons and

4  complaint at Mrs. Lee's office (CGI) instead of her residence.  (Mrs. Lee MTD at 2-3;

5  Mrs. Lee Decl. ¶¶ 3-4.)  Federal Rule of Civil Procedure 4(e) states that an individual may

6  be served in a judicial district of the United States by following the state law for service of

7  process in the state where the district court is located or where service is made, or by

8  specified other means.  Fed. R. Civ. P. 4(e).  Thus, in this case, Mrs. Lee may be served in

9  New Jersey following the service of process laws of New Jersey.  New Jersey law

10 provides that, if two entities are alter egos of one another, then adequate notice and service

11 of process upon one entity constitutes adequate notice and service of process upon the

12 other entity, "so as to meet the requirements of procedural due process."  *Laborers' Local*

13 *Union Nos. 472 & 172 v. Interstate Curb & Sidewalk*, 448 A.2d 980, 986 (N.J. 1982).

14         In its Motion to Dismiss, CGI does not contend that service of the summons and

15 complaint on CGI was improper.  Because adequate notice and service of process was

16 provided to CGI, and Plaintiffs have made a prima facie showing that CGI is the alter ego

17 of Mrs. Lee, then adequate notice and service of process was provided to Mrs. Lee.

18     **D.     Statute of Limitations**

19         In his Motion to Dismiss, Defendant Mr. Lee argues that Plaintiff Ms. Harrelson's

20 claims of intentional infliction of emotional distress (COA 9) and negligent infliction of

21 emotional distress (COA 10) are barred by the applicable statute of limitations and must

22 therefore be dismissed.  (Mr. Lee MTD at 6-10.)  BR and Oasis argue that "numerous of

23 Plaintiffs' claims," without specifying which Plaintiffs or claims, should be dismissed

24 because they are barred by the applicable statute of limitations.  (BR/Oasis MTD at 5-7.)

25 In a separate Motion for Summary Judgment, Defendant DYHC contends that COAs 6 and

26 7 of Plaintiffs Ms. Simeral and Ms. DeRosa, and COAs 6, 7, 9 and 10 of Ms. Harrelson,

27 are barred by the applicable statute of limitations.  (Doc. 102, DYHC Mot. for Summ. J.

28 ("MSJ 2").)  Vortex, Tao, BR and Oasis join DYHC's motion with a one-page Motion for

1   Summary Judgment of their own.  (Doc. 111, Defs. Vortex, Tao, BR and Oasis's Mot. for

2   Partial Summ. J. ("Vortex Joinder").)

3        "[A] complaint may properly be dismissed on motion for failure to state a claim

4   when the allegations in the complaint affirmatively show that the complaint is barred by

5   the applicable statute of limitations."  *Suckow Borax Mines Consol., Inc. v. Borax Consol.,*

6   *Ltd.*, 185 F.2d 196, 205 (9th Cir. 1950).  Likewise, "Rule 56 permits affirmative defenses

7   [such as the statute of limitations] to be raised in a motion for summary judgment."  *Id.*

8        Under Rule 56, summary judgment is properly granted when: (1) no genuine issues

9   of material fact remain; and (2) after viewing the evidence most favorably to the non-

10  moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.

11  56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*,

12  815 F.2d 1285, 1288-89 (9th Cir. 1987).  A fact is "material" when, under the governing

13  substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*,

14  477 U.S. 242, 248 (1986).  A "genuine issue" of material fact arises if "the evidence is

15  such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

16       In considering a motion for summary judgment, the court must regard as true the non-

17  moving party's evidence, if it is supported by affidavits or other evidentiary material.

18  *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289.  However, the non-moving party may

19  not merely rest on its pleadings; it must produce some significant probative evidence tending

20  to contradict the moving party's allegations, thereby creating a material question of fact.

21  *Anderson*, 477 U.S. at 256-57 (holding that the plaintiff must present affirmative evidence in

22  order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz.*

23  *v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

24       In the context of applying a statute of limitations, the question of when an injury was

25  or should have been discovered by a plaintiff, triggering the start of the limitations period, is

26  a question of fact.  *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir.

27  1984).  "It may be decided as a matter of law only when uncontroverted evidence irrefutably

28  demonstrates plaintiff discovered or should have discovered" the injurious conduct.  *Id.*

1   (quotation omitted). However, "equitable tolling and estoppel, which ask whether equity

2   requires extending a limitations period, are for the judge to apply, using her discretion,

3   regardless of the presence of a factual dispute." *Smith-Haynie v. District of Columbia*, 155

4   F.3d 575, 579 (D.C. Cir. 1998); *see also McCloud v. Arizona*, 170 P.3d 691, 695 (Ariz. Ct.

5   App. 2007).

6           **1.**       **Plaintiff Ms. Harrelson's Claims Against Mr. Lee (COAs 9 and 10)**

7           In COAs 9 and 10, Ms. Harrelson raises the common law claims of intentional

8   infliction of emotional distress and negligent infliction of emotional distress against Mr. Lee,

9   alleging that she was sexually assaulted by Mr. Lee while in Korea and suffered "severe

10   emotional distress and physical harm" as a result. (FAC ¶¶ 81-92, 149-154.) Ms. Harrelson

11   states that the sexual assault took place during the night of October 22-23, 2006. (FAC ¶ 84.)

12   She further states that, on the morning after the alleged sexual assault, she "told her supervisor

13   at BR English that she had to resign from being a Dahn Master because Ilchi Lee had sexually

14   assaulted her." (FAC ¶ 91.) She explains that, thereafter, "Dahn made an ongoing concerted

15   effort to convince [her] that what happened was right and natural," and "Dahn isolated [her]

16   from her friends and attempted to prevent her from telling anyone about what happened."

17   (FAC ¶ 92.) Although no time period is specified, Ms. Harrelson states that the meetings in

18   which "Dahn" tried to placate her after the alleged sexual assault "took place in [her]

19   apartment, office, in saunas, and mountain retreats." (*Id.*) Ms. Harrelson alleges that she

20   "was able to break the psychological manipulation and indoctrination sufficiently to leave

21   Dahn in October of 2006." (FAC ¶ 54g.)

22           Plaintiffs filed this lawsuit on May 22, 2009. (Doc. 1, Compl.) From the face of the

23   Complaint, Defendants now move for both a dismissal under Rule 12(b)(6) and summary

24   judgment under Rule 56 of Ms. Harrelson's common law claims against Mr. Lee based on the

25   defense of statute of limitations.[18]

26

27   [18] Defendant Mr. Lee also states, "This Court's subject matter jurisdiction to adjudicate these

28   claims relating to alleged conduct that occurred in a foreign country is highly questionable

1       Plaintiffs chose Arizona as a forum, and Defendant Mr. Lee is an Arizona resident.

2  (FAC ¶ 30.)  For Ms. Harrelson's common law claims against Mr. Lee, the Arizona statute

3  of limitations  period is two years.  Ariz. Rev. Stat. ("A.R.S.") § 12-542.  In Massachusetts,

4  where Ms. Harrelson alleges she is currently a resident, (FAC ¶ 9), the applicable statute of

5  limitations period is three years, Mass. Gen. Laws ch. 260, § 2A.  Ms. Harrelson notes that,

6  in the Republic of Korea, where her injury allegedly occurred, the applicable statute of

7  limitations is also three years.  (Pls.' Opp'n to MSJ 2 at 3 (citing Korean Civil Act, Article

8  766).)

9               **a.     Choice of Statute of Limitations**

10      Ms. Harrelson filed her claims approximately two and a half years after the alleged

11  sexual assault.  In asking the Court to keep her claims alive against the defense of the statute

12  of limitations, Ms. Harrelson first argues that the three year Massachusetts statute of

13  limitations period should apply because of that state's "exceptionally strong interest in having

14  its laws applied to protect its citizens from what happened to Plaintiffs."  (Pls.' Opp'n to MSJ

15  2 at 5.)  Defendants argue that, under Arizona law, the two year Arizona statute of limitations

16  period applies.  (Mr. Lee MTD at 6-7; MSJ 2 at 3-6.)

17      As noted previously, this Court must apply Arizona's choice of law rules in this case.

18  *See Patton,* 276 F.3d at 495.  Arizona courts look to the principles of the Second Restatement

19  of Conflict of Laws to determine the controlling law in a multi-state tort case, including which

20  statute of limitations to apply.  *See Bates,* 749 P.2d at1369; *DeLoach v. Alfred*, 960 P.2d 628,

21  630 (Ariz. 1998).  Restatement § 142 provides, in relevant part:

22          Whether a claim will be maintained against the defense of the statute of
            limitations is determined under the principles stated in § 6.  In general, unless
23          the exceptional circumstances of the case make such a result unreasonable:

24  _____

25  and the action should also be dismissed pursuant to Fed. R. Civ. P. 12(b)(1)."  (Mr. Lee MTD
    at 7 n.2.)  The Court disagrees.  Jurisdiction over these claims is conferred on the Court by
26  28 U.S.C. § 1332(a) based on diversity of citizenship.  Plaintiff is a Massachusetts resident,
    (FAC ¶ 9), Defendant is an Arizona resident, (FAC ¶ 30), and Plaintiff alleges that the
27  amount in controversy for each claim exceeds $75,000, (FAC ¶ 2).  *See Berry v. Lee*, 428 F.
28  Supp. 2d 546, 551 (N.D. Tex. 2006).

1    (1) The forum will apply its own statute of limitations barring the claim.

2    Restatement § 142.  The Arizona Supreme Court has observed that "[t]he general rule stated

3    by section 142 is very clear: as a starting point, the forum's statute of limitations applies."

4    *DeLoach*, 960 P.2d 630.  Arizona's legislature "has expressed only limited interests in

5    importing foreign statutes of limitations, demonstrated by the very narrow scope of our

6    borrowing statute."  *Id.* at 632.  The Arizona Supreme Court has further noted that

7    "exceptional circumstances" may exist that warrant applying a foreign state's statute of

8    limitations if Arizona has no interest in the parties, the events or the litigation.  *Id.* at 632-33.

9    Here, the Court must apply the Arizona statute of limitations "unless the exceptional

10   circumstances of the case make such a result unreasonable."  Citing a note in the Restatement,

11   Ms. Harrelson argues that just such an exceptional circumstance exists in her case because

12   Plaintiffs could not have obtained personal jurisdiction over Mr. Lee in Massachusetts, where

13   they could have availed themselves of the three year limitations period for Ms. Harrelson's

14   claims.  (Pls.' Opp'n to Mr. Lee MTD at 8-9 (citing Restatement § 142 cmt. f).)  However,

15   as discussed previously, Plaintiffs adequately plead an alter ego relationship between Mr. Lee

16   and the corporate Defendants in the FAC.  Plaintiffs also allege that corporate Defendants

17   conducted business in Massachusetts.  (*E.g.*, FAC ¶ 54g ("Ms. Harrelson began attending

18   Dahn Yoga classes at the Body and Brain Club at the Massachusetts Institute of Technology

19   and at the Somerville Dahn Center as well as at the Body and Brain Club at the University of

20   Massachusetts in Amherst.").)  A Massachusetts court would likely have jurisdiction over a

21   corporation operating in Massachusetts and over Mr. Lee as the corporation's alter ego.

22   Indeed, Plaintiffs assert this very theory to show this Court's jurisdiction over Mrs. Lee.

23   Plaintiffs cannot claim this theory is unavailable as to Mr. Lee in order to create an

24   "exceptional circumstance" in an effort to convince the Court to apply the Massachusetts

25   statute of limitations here.

26   Nor is this a case where Arizona has no interest in the litigation.  In *DeLoach*, a

27   California plaintiff was injured by an Arizona defendant in Tennessee.  960 P.2d at 629.  The

28   Arizona Supreme Court concluded that "Arizona has a significant interest in applying the

1  Arizona statute of limitations to claims brought in Arizona against Arizona residents." *Id.* at

2  633.  In the instant case, a Plaintiff from Massachusetts who was residing in Korea was

3  allegedly injured by an Arizona Defendant in Korea.  As in *DeLoach*, an Arizona court would

4  clearly conclude that Arizona has an interest in a claim brought in Arizona against an Arizona

5  resident.   Under Arizona law, this Court must therefore apply the Arizona statute of

6  limitations, which specifies a two year limitations period for the claims that Ms. Harrelson

7  raises against Mr. Lee.

### b.   The Discovery Rule

9        Using supporting affidavits, Ms. Harrelson next argues that she has presented sufficient

10  evidence to avoid summary judgment regarding the fact that she did not "appreciate that she

11  had suffered psychological injury and severe emotional distress as a result of Dahn's wrongful

12  conduct until approximately September of 2008."  (Pls.' Opp'n to MSJ 2 at 9.)  If a jury

13  agrees that Ms. Harrelson did not discover her injury until September 2008, she argues, then

14  the statute of limitations did not begin to run until that date and her common law claims were

15  timely filed.  (*Id.* at 7-8.)  Defendants contend that the face of the FAC disposes of this

16  argument, because it states that "Ms. Harrelson was able to break the psychological

17  manipulation and indoctrination sufficiently to leave Dahn in October of 2006."  (MSJ 2 at

18  7; *see also* FAC ¶ 54g.)

19        Under the discovery rule, the accrual of a claim is delayed until the plaintiff knew, or

20  had "reason to know by the exercise of reasonable diligence," that it was harmed by the

21  defendant's conduct.  *Floyd v. Donahue,* 923 P.2d 875, 878 (Ariz. Ct. App. 1996) (quotation

22  omitted).  The rationale for the discovery rule "is that it is unjust to deprive a plaintiff of a

23  cause of action before the plaintiff has a reasonable basis for believing that a claim exists."

24  *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.,* 898 P.2d 964, 968 (Ariz. 1995).

25  Consistent with this notion, a plaintiff "discovers" its claims, for statute of limitations

26  purposes, when it becomes aware of the facts that constitute its cause of action.  *Id.* at 967;

27  *see also Doe v. Roe,* 955 P.2d 951, 960-61 (Ariz. 1998).  In other words, to trigger Arizona's

28  personal injury statute of limitations, the "injured person 'need not know all the facts

1   underlying a cause of action . . . [but] must at least possess a minimum requisite of knowledge

2   sufficient to identify that a wrong occurred and caused injury.'" *Walk v. Ring*, 44 P.3d 990*,*

3   996 (Ariz. 2002) (quoting *Roe*, 955 P.2d at 961).   The injured person has an affirmative duty

4   "to investigate with due diligence to discover the necessary facts" underlying a wrong.  *Doe*,

5   955 P.2d at 962.   Arizona courts generally apply the discovery rule to tort actions that are

6   governed by the personal injury statute of limitations, A.R.S. § 12-542.  *See Davis v. Dow*

7   *Chem. Corp.,* 819 F.2d 231, 233 (9th Cir. 1987) (collecting cases supporting this proposition);

8   *Anson v. Am. Motors Corp.,* 747 P.2d 581, 584 (Ariz. Ct. App. 1987).

9        In support of her argument that she did not "discover" her injury until September 2008,

10  Ms. Harrelson provides her own affidavit and two from Dr. Cathleen Mann, a psychologist

11  and counselor specializing in high demand, totalistic, authoritarian groups ("cults") and their

12  use of misrepresentation, fraud, undue influence and thought reform, among other techniques,

13  on their participants.[19]  (Pls.' Opp'n to MSJ 1, Mann Decl. ¶ 1; Pls.' Opp'n to MSJ 2, Mann

14  Decl. ¶ 1.)  In her own affidavit, Ms. Harrelson admits: "I was aware that Ilchi Lee's sexual

15  abuse of me was wrongful almost immediately after it occurred."  (Pls.' Opp'n to MSJ 2,

16  Harrelson Decl. ¶ 58.)  Dr. Mann agrees.  (Pls.' Opp'n to MSJ 2, Mann Decl. ¶ 15.)  Ms.

17  Harrelson's claim therefore differs significantly from those in which an Arizona court has

18  determined that the date of a plaintiff's discovery or her injury was long after the tort was

19  committed.  *See, e.g., Doe*, 955 P.2d at 961-62 (finding that plaintiff survived summary

20  judgment on the defense of statute of limitations by showing that she had repressed any

21  memory of sexual abuse until a much later date, raising a factual question as to when she

22  "discovered" her injury for statute of limitations purposes).  By her own admission, Ms.

23  Harrelson had a minimum requisite of knowledge sufficient to identify that a wrong occurred

24

25  _____

26  [19] Defendant Vortex challenges the admissibility of Dr. Mann's affidavit, asserting that she
    is unqualified to testify regarding the soundness of a person's mind under Arizona's tolling

27  statute, A.R.S. § 12-502.  (Reply to Vortex Joinder at 8-9.)  This issue is moot, because, as
    explained below, the Court is not asked to determine whether Plaintiffs were of "unsound

28  mind" under § 12-502 here.

1   and caused injury right after the alleged sexual assault.  Because the discovery rule turns on

2   that minimum requisite of knowledge, no genuine issue of material fact remains; Ms.

3   Harrelson "discovered" her injury in October 2006, not September 2008.

4                       **c.      Equitable Tolling**

5          In the FAC, Plaintiffs state that they "were unable to appreciate the wrongful nature

6   of Defendants' conduct complained of herein until they escaped Defendants' undue

7   influence." (FAC ¶ 159.)  Plaintiffs therefore ask the Court to toll the statute of limitations

8   period as a matter of equity for the time that they were under Defendants' alleged undue

9   influence. (*Id.*)  Defendants again contend that, even if equitable tolling were appropriate, the

10  Court should only toll the limitations period until each Plaintiff was "able to break the

11  psychological manipulation and indoctrination sufficiently to leave Dahn." (Mr. Lee MTD

12  at 9; MSJ 2 at 7; *see also* FAC ¶ 54.)  For Ms. Harrelson, the FAC alleges that date as October

13  2006, and the Defendants therefore contend that her claims are still time-barred.[20]  (*See* FAC

14  ¶ 54g.)

15         "Time requirements in lawsuits between private litigants are customarily subject to

16  equitable tolling." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990) (quotation

17  omitted).  "Under equitable tolling, plaintiffs may sue after the statutory time period for filing

18  a complaint has expired if they have been prevented from filing in a timely manner due to

19  sufficiently inequitable circumstances." *McCloud*, 170 P.3d at 696 (quotation omitted).  Both

20  Arizona and federal courts recognize and apply the equitable tolling doctrine. *Id.* (collecting

21  cases).   Courts apply the doctrine "sparingly," but have allowed tolling "where the

22  complainant has been induced or tricked by his adversary's misconduct into allowing the

23

24  [20] In the Replies to their Motions for Summary Judgment, both DYHC and Vortex raise for
    the first time Arizona's statutory basis for tolling of the statute of limitations period, namely,
25  A.R.S. § 12-502 (requiring tolling if plaintiff is of "unsound mind").  While such a claim
    could be related to their tolling arguments, Plaintiffs never raise this statutory provision as
26  a basis for the Court to toll the limitations period, and Defendants may not raise new
    arguments in Reply to their own Motions for Summary Judgment. *See Eberle v. City of*
27  *Anaheim*, 901 F.2d 814, 817-18 (9th Cir. 1990).

28

1    filing deadline to pass." *Irwin*, 498 U.S. at 96 (citations omitted).   Courts also apply the

2    doctrine when a plaintiff is delayed or unfairly prejudiced by legal procedure, such as when

3    a motion is pending before the court that delays the filing of the claim, or when a complainant

4    is caught up pursuing a claim through administrative procedures.  *McCloud*, 170 P.3d at 696

5    (citations omitted).

6         The Plaintiffs contend that Ms. Harrelson was unable to timely file her claims on

7    account of "psychological manipulation," "indoctrination," and "weakness of mind" resulting

8    from Defendants' "undue influence." (FAC ¶ 159.)  In her own affidavit, Ms. Harrelson avers

9    that, around the time of the alleged assault, she "was over $50,000.00 in debt and had almost

10   no money in the bank." (Pls.' Opp'n to MSJ 2, Harrelson Decl. ¶ 57.)  Ms. Harrelson explains

11   that she did not have enough money to leave Korea after the alleged sexual assault, and she

12   "was compelled to continue working for BR English until [she] could save enough money to

13   move back to Massachusetts." (*Id.*)  For at least part of this period, Ms. Harrelson states that

14   she was "on a student visa that gave [her] no legal clearance to work" and "was paid under

15   the table." (*Id.* ¶ 46.)   Ms. Harrelson further states that, after the alleged assault, Dahn

16   Masters "made an ongoing concerted effort to convince [her] that what happened was right

17   and natural," and they isolated her from her friends and attempted to prevent her from telling

18   anyone what happened.  (*Id.* ¶ 56.)  Ms. Harrelson avers that she was finally able to leave

19   Korea in October 2008, two years after the alleged assault.[21]  (*Id.*)  Defendants point out that

20   "plaintiff Harrelson has candidly conceded and admitted that she broke off her relationship

21   with Dahn Yoga the day after her alleged sexual encounter," and she therefore could not have

22   been under Dahn's "undue influence" after the encounter.  (Mr. Lee MTD at 9.)

23        In considering Defendants' Motions for Summary Judgment, the Court must take Ms.

24   Harrelson's allegations as true. *See Celotex*, 477 U.S. at 324.  Further, because Plaintiffs raise

25

---

26   [21] In her affidavit, Dr. Mann states that Ms. Harrelson did not "have the legal standing or
     awareness of how to report [the sexual assault] to the Korean authorities."  (Pls.' Opp'n to
27   MSJ 2, Mann Decl. ¶ 15.)  This statement is a legal conclusion that is beyond the scope of
     Dr. Mann's expertise and is not based on personal knowledge.
28

1  a question of equity that the Court must decide as a matter of justice, the Court considers all

2  of the testimony provided by Ms. Harrelson.  As alleged, the facts show that Ms. Harrelson

3  clearly did not end her relationship with Korean affiliates of Dahn the day after the alleged

4  sexual assault.  Although she resigned as a Dahn Master, other Dahn Masters continued to

5  have conversations with her in which they tried to convince her that the alleged sexual assault

6  was "right and natural."   Dahn Masters also attempted to prevent her from telling others

7  about the incident.  Ms. Harrelson continued to work for BR English in Korea; indeed, she

8  asserts that she was compelled to do so to make enough money to return to the U.S.  This

9  assertion is buttressed by Ms. Harrelson's allegation that she had no legal permission to work

10  in Korea, likely making it difficult for her to secure employment that was not affiliated with

11  Dahn.  In addition, Ms. Harrelson was in debt and had virtually no money.  Ms. Harrelson's

12  allegations indicate that she was essentially trapped in Korea until she could make enough

13  money through her work with Dahn to return home, and this restricted (if not blocked) her

14  access to the U.S. judicial system.

15  　　"[N]o man may take advantage of his own wrong."  *Glus v. Brooklyn E. Dist.*

16  *Terminal*, 359 U.S. 231, 232 (1959).  If Defendants were responsible for creating and

17  maintaining the situation that trapped Ms. Harrelson in Korea for a period long enough for the

18  statute of limitations period to pass, then they should not now be able to assert the statute of

19  limitations to bar Ms. Harrelson's suit against Mr. Lee.  *See id.* at 232-35.  The Court would

20  consider such an instance to be one of the rare ones in which tolling the statute of limitations

21  period would be appropriate in the interests of justice.  The tolling period would correspond

22  to the period that the U.S. judicial system was inaccessible to Ms. Harrelson while she was

23  compelled to stay in Korea.  *See id.*  However, genuine issues of material fact exist regarding

24  whether Ms. Harrelson was trapped in Korea, for how long, and whether it was at the hands

25  of Defendants.  It would be inappropriate for the Court to make the decision on equitable

26  tolling without resolution of these issues of fact.  As a result, any dismissal of Ms. Harrelson's

27  claims against Mr. Lee is premature, and the Court therefore denies Defendants' Motions to

28

Dismiss and Motions for Summary Judgment on Ms. Harrelson's claims against Mr. Lee (COAs 9 and 10).  *See id.* at 235.

**2.      Claims of Plaintiffs Ms. Harrelson, Ms. Simeral and Ms. DeRosa Against All Defendants (COAs 6 and 7)**

In COA 6, all Plaintiffs assert a claim of intentional infliction of emotional distress against all Defendants.  (FAC ¶¶ 130-132.)  In COA 7, all Plaintiffs assert a claim under the FLSA for unpaid wages and overtime against all Defendants.  (FAC ¶¶ 133-139.)  With regard to three Plaintiffs only–Ms. Harrelson, Ms. Simeral and Ms. DeRosa–Defendant DYHC, joined by Vortex, Tao, BR and Oasis, now move for summary judgment of COAs 6 and 7 based on the defense of statute of limitations.[22]  (MSJ 2 at 2.)  These Defendants point the Court to the fact that all three Plaintiffs allege that they were "able to break the psychological manipulation and indoctrination sufficiently to leave Dahn" more than two years before they filed the instant lawsuit.  (FAC ¶ 54g (Ms. Harrelson's breakaway date was October 2006); ¶ 54w (Ms. Simeral's breakaway date was January 2007); ¶ 54d (Ms. DeRosa's breakaway date was March 2007).)  Because Plaintiffs brought this lawsuit in May 2009, Defendants argue, these Plaintiffs' claims of intentional infliction of emotional distress (COA 6) and FLSA violations (COA 7) are time barred and should be dismissed.  (MSJ 2 at 3.)

**a.      Claim of Intentional Infliction of Emotional Distress (COA 6)**

Ms. Harrelson and Ms. DeRosa are residents of Massachusetts, (FAC ¶¶ 6, 9), and Ms. Simeral is a resident of New Hampshire, (FAC ¶ 25). With respect to the choice of a statute of limitations for the common law claim of intentional infliction of emotional distress (COA 6), the Court again applies Arizona's statute of limitations for the reasons already stated.  The applicable statute specifies a limitations period of two years for a personal injury claim. A.R.S. § 12-542.

---

[22] As discussed previously, Plaintiffs fail to adequately plead their claims under the FLSA, but they have the opportunity to amend their pleading.  The Court therefore considers Defendants' motions for partial summary judgment on these claims in the alternative.

1    Using supporting affidavits, Plaintiffs contend that "a triable issue of fact exists as to

2 when each of the Plaintiffs recovered sufficiently from the Defendants' psychological

3 manipulation, coercive persuasion, thought reform, and undue influence so as to be able [to]

4 appreciate both the wrongful nature of Defendants' conduct and the fact they had suffered

5 psychological injury and severe emotional distress as a result." (Pls.' Opp'n to MSJ 2 at 8.)

6 In other words, under the discovery rule, Plaintiffs argue that the limitations period on their

7 claims did not begin to run until they discovered their claims, and genuine issues of material

8 fact exist regarding when that was. (*Id.* at 8-10.)

9    In her first affidavit, Dr. Mann details the techniques of "coercive persuasion" and

10 "thought reform" she states were employed by "Dahn." (Pls.' Opp'n to MSJ 1, Mann Decl.

11 ¶¶ 11, 12, 17-25.) In her second affidavit, Dr. Mann goes on to explain that, as a result of

12 these techniques, Plaintiffs were not "capable of appreciating that they had suffered

13 psychological injury and severe emotional distress as a result of Dahn's wrongful conduct"

14 following their physical exit from Dahn. (Pls.' Opp'n to MSJ 2, Mann Decl. ¶ 6.) Dr. Mann

15 states, "Merely physically exiting a high demand group on a certain date does not mean the

16 undue influence of the group has 'worn off.'" (*Id.* ¶ 4.) Dr. Mann concludes that, as a result

17 of the coercive persuasion and thought reform these Plaintiffs underwent at the hands of

18 "Dahn," they did not understand that they had suffered psychological injury and severe

19 emotional distress until long after their physical exits, or until October 2008 for Ms. Simeral,

20 March 2009 for Ms. DeRosa, and September 2008 for Ms. Harrelson. (*Id.* ¶¶ 10, 11, 13.)

21 Defendants do not provide any testimony in reply, but rely instead on the dates that Plaintiffs

22 said they physically exited from "Dahn" to argue that Plaintiffs' claims are time-barred. (*E.g.*

23 MSJ 2 at 7.)

24    Plaintiffs provide enough evidence in their supporting affidavits to raise a genuine

25 issue as to when they had the "minimum requisite of knowledge sufficient to identify that a

26 wrong occurred and caused injury" under the discovery rule. *See Walk*, 44 P.3d at 996.

27 Resolution of this factual issue is required to determine whether Plaintiffs discovered their

28 claims less than two years before the date when those claims were brought. As a result, the

1    three Plaintiffs at issue have done enough to avoid summary judgment on their claim of

2    intentional infliction of emotional distress (COA 6).

3                    **b.      Claim of FLSA Violations (COA 7)**

4            The FLSA specifies a two year limitations period unless the cause of action arises out

5    of a "willful violation," in which case the limitations period is three years. 29 U.S.C. §

6    255(a).   The statute of limitations for an FLSA claim accrues "the day the employee's

7    paycheck is normally issued, but isn't." *Biggs v. Wilson*, 1 F.3d 1537, 1540 (9th Cir. 1993).

8    The FLSA limitations period is subject to the doctrine of equitable tolling. *See Partlow v.*

9    *Jewish Orphans' Home of S. Cal., Inc.*, 645 F.2d 757, 760 (9th Cir. 1981), *overruled on other*

10   *grounds by Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165 (1989); *see also Stallcop v.*

11   *Kaiser Found. Hosps.*, 820 F.2d 1044, 1050 (9th Cir. 1987) ("Equitable tolling requires that

12   [plaintiff] was excusably ignorant of the limitations period.").

13           Plaintiffs argue that the Court should toll the limitations period as a matter of equity,

14   because "Defendants utilized psychological manipulation, coercive persuasion, thought

15   reform and undue influence to induce Plaintiffs to refrain from asserting their legal rights until

16   the FLSA filing deadline had passed." (Pls.' Opp'n to MSJ 2 at 10.) Plaintiffs support this

17   argument with affidavits from each of the three Plaintiffs at issue and Dr. Mann. Defendants

18   contend that Plaintiffs fail to show either that a Defendant employer "concealed its acts with

19   the result that plaintiff was unaware of their existence," or that Plaintiffs' FLSA injury was

20   "inherently unknowable at accrual date." (Reply to Vortex Joinder at 10 (*quoting Udvari v.*

21   *United States*, 28 Fed. Cl. 137, 139-40 (Fed. Cl. 1993).)

22           Taking Plaintiffs' allegations as true, Plaintiffs do not provide the Court with sufficient

23   basis to toll the statute of limitations as a matter of equity.   Plaintiffs do not provide evidence

24   that Defendants concealed their alleged underpayment of Plaintiffs to prevent them from

25   bringing claims under the FLSA.   Nor do Plaintiffs state that they were unaware that they had

26   been underpaid.   In short, Plaintiffs fail to show that any tardy FLSA claims are a result of

27   misrepresentation or misconduct on the part of Defendants or that Plaintiffs were "excusably

28   ignorant" of the FLSA limitations period. *See Stallcop*, 820 F.2d at 1050.   The Court

1    therefore declines to equitably toll the statute of limitations period on these three Plaintiffs'

2    FLSA claims.  Plaintiffs' claims accrued the day Plaintiffs should have been paid for their

3    work, but were not.  *See Biggs,* 1 F.3d at 1540.

4          Plaintiffs also argue that Defendants' violations under the FLSA were "willful," and

5    the three year limitations period should therefore apply.  (Pls.' Opp'n to MSJ 2 at 10.)  In

6    support of this argument, Plaintiffs cite the FAC, where they allege that "Defendants

7    coercively induced Plaintiffs to underreport the hours they were working in order to avoid

8    having to pay Plaintiffs overtime compensation," and "Defendants failed to keep accurate

9    records of the hours worked by Plaintiffs."  (Pls.' Opp'n to MSJ 2 at 10; *see also* FAC ¶¶ 80,

10   136.)  As noted earlier, however, the FAC does not identify the Defendant or Defendants for

11   whom Plaintiffs did work, nor does it sufficiently establish the employee-employer

12   relationship.  In any case, neither Defendants nor Plaintiffs properly support their assertions

13   regarding "willfulness" for the Court to decide a summary judgment motion.  Genuine issues

14   remain as to whether Defendants' alleged violations were "willful" to trigger the three year

15   FLSA limitations period.  Because the Plaintiffs at issue all allege that they were still engaged

16   with Defendants within three years before they brought their FLSA claim, summary judgment

17   dismissing these Plaintiffs' FLSA claim (COA 7) is inappropriate.

18         **E.    Rule 12(f) Motion to Strike**

19         Pursuant to Federal Rule of Civil Procedure 12(f), Defendants Mr. Lee and DYHC ask

20   the Court to strike Ms. Harrelson's allegations of sexual assault against Mr. Lee as immaterial,

21   impertinent and scandalous.  (Mr. Lee MTD at 10; DYHC MTD at 26-27.)  Specifically, these

22   Defendants move to strike ¶¶ 45, 60, 81-92, 102 and 149-154 of the FAC, all of which pertain

23   to Ms. Harrelson's allegations of sexual assault or incorporate the allegations by reference.[23]

24         Rule 12(f) allows the court to "strike from any pleading" any matter that is "redundant,

25   immaterial, impertinent, or scandalous."  Fed. R. Civ. P. 12(f).  "The function of a 12(f)

26

27   [23] Defendants BR and Oasis also move to strike portions of the FAC under Rule 12(f).

28   (BR/Oasis MTD at 5; BR/Oasis Reply to MTD at 10-11.)  However, these Defendants do not
     identify which paragraphs of the FAC they move to strike or the specific grounds therefor.

- 47 -

1    motion to strike is to avoid the expenditure of time and money that must arise from litigating

2    spurious issues by dispensing with those issues prior to trial . . . ." *Fantasy, Inc. v. Fogerty*,

3    984 F.2d 1524, 1527 (9th Cir. 1993) (quotation omitted), *rev'd on other grounds*, 510 U.S.

4    517 (1994).  "'Immaterial' matter is that which has no essential or important relationship to

5    the claim for relief or the defenses being pleaded," and "'[i]mpertinent' matter consists of

6    statements that do not pertain, and are not necessary, to the issues in question."  *Id.* (quoting

7    5 Charles A. Wright & Arthur R. Miller, *Fed. Practice & Procedure* § 1382, at 706-07, 711

8    (2d ed. 1990)).  "'Scandalous' matter is that which improperly casts a derogatory light on

9    someone, most typically on a party to the action."  *Stricker v. Nev. Sys. of Higher Educ.*, No.

10   03:06-CV-00613-LRH-VPC, 2007 WL 2460036, at *4 (D. Nev. Aug. 24, 2007) (quoting 5C

11   Wright & Miller, *Fed. Practice & Procedure* § 1382 (3d ed. 2004)).

12         "Rule 12(f) motions are generally viewed with disfavor and not ordinarily granted

13   because they are often used to delay and because of the limited importance of the pleadings

14   in federal practice.  A motion to strike should not be granted unless it is absolutely clear that

15   the matter to be stricken could have no possible bearing on the litigation."  *Brewer v. Indymac

16   Bank*, 609 F. Supp. 2d 1104, 1113 (E.D. Cal. 2009) (citations omitted).

17         Here, Ms. Harrelson's claims of sexual assault survive Defendants' motions to dismiss

18   and motions for summary judgment on the defense of statute of limitations.  Ms. Harrelson's

19   allegations against Mr. Lee are therefore not "immaterial" or "impertinent," and the Court

20   declines to strike the allegations on these bases.

21         Nor are Ms. Harrelson's allegations "scandalous" within the meaning of Rule 12(f).

22   To the extent that Ms. Harrelson's allegations "cast a derogatory light" on Mr. Lee, they do

23   not do so "improperly" because they are made as the factual basis to assert valid tort claims.

24   The Court therefore declines to strike Ms. Harrelson's allegations against Mr. Lee under Rule

25   12(f).

26         **F.      Motion for Summary Judgment on the Claims of Plaintiffs Ms. Vogel, Ms.
              Simeral and Ms. Gargosh**

27

28

1    In a separate motion, Defendant DYHC moves for summary judgment on all of the

2  claims of three Plaintiffs–Ms. Vogel, Ms. Simeral and Ms. Gargosh–on account of money

3  settlements that these Plaintiffs purportedly entered into with DYHC. (MSJ 1 at 2.)  DYHC

4  contends that the terms of the Stipulations for Settlement released any and all claims these

5  Plaintiffs have against DYHC. (*Id.*)  In response, Plaintiffs argue that, if the Stipulations are

6  valid, the settlement terms released only a narrow range of possible claims.  (Pls.' Opp'n to

7  MSJ 1 at 1.)   The three Plaintiffs at issue also argue that they were under undue influence

8  from DYHC when they entered into the agreements, and the agreements are therefore

9  voidable. (*Id.*)  Finally, Plaintiff Ms. Gargosh contends that, while she did sign a document

10 when she received money from DYHC, she does not recognize or recall signing the

11 Stipulation now produced by DYHC. (*Id.*)  In considering Defendant DYHC's Motion for

12 Summary Judgment, the Court must regard as true the Plaintiffs' evidence, if it is supported

13 by affidavits or other evidentiary material. *See Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d

14 at 1289.

15                    **1.    Ms. Vogel's Stipulation for Settlement**

16    Plaintiff Ms. Vogel is a resident of Massachusetts, and Defendant DYHC is

17 incorporated and has its principal place of business in Arizona. (FAC ¶¶ 29, 32, 35.) In 2004,

18 DYHC employed Ms. Vogel as a yoga instructor and assistant manager in the Newton Dahn

19 Center, one of DYHC's facilities near Boston, Massachusetts.  (MSJ 1, Defs.' Separate

20 Statement of Facts ("DSOF") ¶ 7; Pls.' Opp'n to MSJ 1, Pls.' Separate Statement of Facts

21 ("PSOF") ¶ 7; Pls.' Opp'n to MSJ 1, Vogel Decl. ¶ 24.)  DYHC paid Ms. Vogel bonuses

22 based in part on the number of memberships to DYHC she sold. (DSOF & PSOF ¶ 8.)  While

23 apparently still in Massachusetts, Ms. Vogel used her own funds to purchase memberships for

24 others, and she contends she did so because she felt pressure to help the Boston-area yoga

25 center managers meet high income targets–referred to as "Vision"–and that DYHC condoned

26 the practice. (DSOF ¶ 10; PSOF ¶¶ 10, 12; Vogel Decl. ¶¶ 23-24.)  Ms. Vogel contends that

27 she decided to set "realistic income targets" for her Boston-area yoga center in June 2007, for

28 which she was "berated" by DYHC and sent to an Arizona training center for "re-education."

(PSOF ¶ 12.)  In September 2007, while in Arizona, Ms. Vogel contends that she requested and received a refund of $5,500 from DYHC for a membership she purchased for someone else to meet her "Vision" income targets.  (DSOF & PSOF ¶¶ 12-14).  Shortly thereafter, Ms. Vogel left the DYHC training facility in Arizona and drove to Aspen, Colorado.  (Vogel Decl. ¶ 35.)  While apparently still in Colorado, Ms. Vogel requested an additional refund of $15,000 from DYHC for two other memberships she purchased for others.  (DSOF & PSOF ¶¶ 12-14; Vogel Decl. ¶ 35.)  As a condition of payment, DYHC requested that Ms. Vogel sign a Stipulation for Settlement.  (DSOF & PSOF ¶ 15.)  On October 2, 2007, while apparently still in Colorado, Ms. Vogel signed the Stipulation.  (DSOF & PSOF ¶ 16; MSJ 1, Kim Decl., Ex. A (including fax cover sheet from Colorado).)  Thereafter, DYHC paid Ms. Vogel the additional $15,000.  (DSOF & PSOF ¶ 16.)

The Stipulation provides, in relevant part:

1. Dahn Yoga Center shall pay to Lucie J. Vogel the total sum of $20,500 in full settlement and compromise of his/her claims and <u>in release and discharge of any and all claims and causes of action made by him/her</u>, and <u>in release and discharge of any and all claims and causes of action arising out of his/her employment with [DYHC] and/or loans made by 3rd parties to him/her and used for the benefit of the Dahn Centers in Massachusetts, Sun Institute and Sedona Mago Garden in Arizona.</u>

2. Lucie J. Vogel . . . [agrees] that such payment shall <u>fully and forever discharge and release all claims and causes of action, whether now known or now unknown, which they [*sic*] have against [DYHC] and any and all of its agents or employees arising out of the claims made by Lucie J. Vogel.</u>

8. In the event any 3rd parties make a claim against Dahn Center for loans or refunds that were supposed to be returned by Lucie J. Vogel then he/she will indemnify and hold [DYHC] harmless from any costs [DYHC] has to bear in responding to or settling such claims.

(MSJ 1, Kim Decl., Ex. A (emphasis added).)

### a.   Choice of Contract Law

As a threshold matter, the Court must determine which state's substantive law to apply in interpreting the Stipulation between DYHC and Ms. Vogel and in deciding whether DYHC exerted undue influence on Ms. Vogel.  The Stipulation does not include a choice of law provision.  In its motion, DYHC argues that Arizona law should apply, because DYHC drafted the Stipulation in its corporate offices in Arizona and the settlement funds were

disbursed from Arizona.  (MSJ 1 at 7.)  In its Reply, DYHC further argues that "[n]o other state [but Arizona] has such a demonstrable relationship with so many Plaintiffs."  (Reply to MSJ 1 at 3.)  The Plaintiffs contend that the law of the home states of each Plaintiff should apply, because each Plaintiff was "recruited and worked for DYHC in their home states," and, among other things, "[t]his is also where the Plaintiffs were coercively induced to pay for most of their Dahn Yoga classes, programs and retreats" and "coercively induced to work excessive hours for unreasonably low and unlawful compensation."  (Pls.' Opp'n to MSJ 1 at 2-3.)

     To reiterate, a multi-plaintiff, multi-defendant, multi-issue case such as this one requires individualized choice of law analyses.  *See Keene Corp.*, 597 F. Supp. at 941.  This Court applies Arizona's choice of law rules in this case.  *See Patton*, 276 F.3d at 495. Arizona looks to the Second Restatement of Conflict of Laws to determine the controlling law in a multi-state contract case.  *Swanson v. Image Bank, Inc.*, 77 P.3d 439,  441 (Ariz. 2003). Section 188 of the Restatement provides, in relevant part:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
>
> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>> (a) the place of contracting,
>> (b) the place of negotiation of the contract,
>> (c) the place of performance,
>> (d) the location of the subject matter of the contract, and
>> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement § 188.  Comment e of § 188 notes that the place of contracting "is the place where occurred the last act necessary . . . to give the contract binding effect," and this, standing alone, "is a relatively insignificant contact."  *Id.* cmt. e.  However, the state where the contract is to be performed "has an obvious interest in the nature of the performance."  *Id.* Only a handful of Arizona cases have required a court to resolve which state has more

1  substantial contacts to litigation involving a multi-state contract. *See, e.g., Landi v. Arkules*,

2  835 P.2d 458, 462-63 (Ariz. Ct. App. 1992) (applying Arizona law to the interpretation of an

3  agreement negotiated and executed in New York because conduct took place in Arizona, real

4  property was located in Arizona, and claim was brought in Arizona); *Aries v. Palmer Johnson,*

5  *Inc.*, 735 P.2d 1373, 1381 (Ariz. Ct. App. 1987) (applying Arizona law to determine whether

6  attorneys' fees were recoverable in a multi-state contract action because action was brought

7  in Arizona court); *Taylor v. Sec. Nat'l Bank*, 514 P.2d 257, 261 (Ariz. Ct. App. 1973)

8  (applying California law to the interpretation of a contract that was executed and performed

9  in California, but Arizona law to the issue of whether attorneys' fees were recoverable

10  because the action was brought in Arizona).

11      The particular issues before the Court here are the interpretation of Ms. Vogel's

12  release of claims arising from her employment at DYHC and whether DYHC exerted

13  undue influence on Ms. Vogel.  The litigation of these issues has substantial contacts with

14  Massachusetts.  Ms. Vogel is a resident of Massachusetts and, importantly, both the

15  subject matter of the Stipulation–Ms. Vogel's employment at a DYHC facility in the

16  Boston area– and the performance of the Stipulation–payment of money to Ms.

17  Vogel–were in Massachusetts.  While the negotiation and execution of the Stipulation

18  apparently occurred in Arizona and Colorado, and the Defendant DYHC is incorporated in

19  Arizona, the Stipulation arises from DYHC's operation of yoga centers in Massachusetts

20  and employment of Ms. Vogel in Massachusetts.  Massachusetts clearly has the most

21  significant relationship to the transaction and the parties with respect to the validity and

22  enforcement of the Stipulation. *See Taylor,* 514 P.2d at 261.

23                    **b.      The Scope of the Release of Claims**

24      The Court first notes that the only Defendant that was a party to the Stipulation for

25  Settlement was DYHC.  Any claims the Stipulation releases are therefore only claims

26  against DYHC, and not the other Defendants in this lawsuit.  DYHC does not argue

27  differently.

28

1      However, the scope of claims released by the terms of the Stipulation is in dispute.

2 DYHC contends that the Stipulation's terms release all possible future claims that Ms.

3 Vogel may have.  (MSJ 1 at 8.)  Ms. Vogel argues that the Stipulation's terms release only

4 claims arising from her requests for a refund of the memberships she purchased for others,

5 or, at minimum, that a genuine dispute exists as to the Stipulation's terms, precluding

6 summary judgment.  (Pls.' Opp'n to MSJ 1 at 4-5.)

7      In Massachusetts,[24] "a right which has not yet arisen may be made the subject of a

8 covenant not to sue or may be released."  *Cormier v. Cent. Mass. Chapter of Nat'l Safety*

9 *Council*, 620 N.E.2d 784, 786 (Mass. 1993) (quotation omitted).  Therefore, a defendant

10 can validly demonstrate that it exempted itself from liability by obtaining a release from

11 the plaintiff.  *Id.*  The interpretation of a release "turns on the expectations and intentions

12 of the parties, at the time of agreement, with regard to the future effect" of the release.

13 *Atlas Track Corp. v. Crosby*, 671 N.E.2d 954, 957 (Mass. App. Ct. 1996) (quotations

14 omitted).  "[A]ny doubts about the interpretation of the release must be resolved in the

15 plaintiff's favor."  *Cormier*, 620 N.E.2d at 786.  "If a contract . . . is unambiguous, its

16 interpretation is a question of law that is appropriate for a judge to decide on summary

17 judgment.  Where, however, the contract . . . has terms that are ambiguous, uncertain, or

18 equivocal in meaning, the intent of the parties is a question of fact to be determined at

19 trial."  *Seaco Ins. Co. v. Barbosa*, 761 N.E.2d 946, 951 (Mass. 2002) (citations omitted).

20      In ¶ 1 of the Stipulation, Ms. Vogel released "any and all claims and causes of

21 action made by him/her" and "any and all claims and causes of action arising out of his/her

22 _____

23 [24] The Court notes that Arizona law does not appear to differ significantly from

24 Massachusetts law with regard to the interpretation of a release.  *See Taylor v. State Farm Mut. Ins. Co.*, 854 P.2d 1134, 1138 (Ariz. 1993) (noting that, in Arizona, "a court will

25 attempt to enforce a contract according to the parties' intent"); *Leo Eisenberg*, 785 P.2d at 52 (noting that a determination of whether a contract is ambiguous is a question of law, and

26 "[i]f the agreement can be reasonably construed in more than one manner, the terms are ambiguous and subject to a determination by the trier of fact about the intent of the parties,

27 based on extrinsic evidence"); *Parrish v. United Bank of Ariz.*, 790 P.2d 304, 306 n.3 (Ariz.

28 App. Ct. 1990) (noting that a release is a contract).

1   employment with [DYHC] and/or loans made by 3rd parties to him/her." (MSJ 1, Kim

2   Decl., Ex. A.) By its plain language, ¶ 1 states that Ms. Vogel released DYHC from

3   liability for claims she had already "made" and claims "arising out of [her] employment

4   with [DYHC]" and associated third party loans.

5          A determination of whether any of Ms. Vogel's claims in the present lawsuit had

6   already been made against DYHC at the time of the execution of the Stipulation is a

7   factual question. Ms. Vogel argues that the extent of her claims was reimbursement for

8   three memberships, and the claim amount ($20,500) matches the reimbursement amount.

9   (Pls.' Opp'n to MSJ 1 at 5; Vogel Decl. ¶ 35.) DYHC provides evidence that Ms. Vogel

10  "made reference to loans she had made or co-signed that she said were over $140,000 and

11  demanded that [DYHC] pay her $20,500 to settle her alleged claims." (MSJ 1, Kim Decl.

12  ¶ 18.) In either case, the claims that the Stipulation settled did not extend beyond

13  reimbursement for memberships Ms. Vogel had purchased for others. This conclusion is

14  buttressed by ¶ 8 of the Stipulation, which addresses possible claims over loans made by

15  Ms. Vogel to third parties for memberships. *See Warfield v. Beth Israel Deaconess Med.*

16  *Ctr., Inc.* 910 N.E.2d 317, 328 (Mass. 2009) (noting that contracts are to be read as a

17  whole to determine the intent of the parties). The only dispute is whether the Stipulation

18  settled Ms. Vogel's claim for her purchase of three memberships, or more than three

19  memberships. Because the parties offer conflicting evidence on this question, it must be

20  resolved by a jury.

21         The terms of ¶ 1 do not purport to release future or unknown claims except to the

22  extent that they arise out of Ms. Vogel's employment with DYHC and associated third

23  party loans. Now that the future has arrived, any of Ms. Vogel's present claims against

24  DYHC arising solely from her employment with DYHC (as opposed to those arising from

25  her participation in DYHC's yoga classes or training programs) are barred by the

26  Stipulation as a matter of law. Thus, because COA 7, alleging federal wage and hour law

27

28

1  violations, can arise solely from Ms. Vogel's employment, that claim is barred by the

2  Stipulation with respect to DYHC.[25]

3        In ¶ 2 of the Stipulation, Ms. Vogel released "all claims and causes of action,

4  whether now known or unknown, which they [*sic*] have against [DYHC] and any and all

5  of its agents or employees arising out of the claims made by Lucie J. Vogel."  By the plain

6  language of ¶ 2, Ms. Vogel released DYHC from liability for any future or unknown

7  claims "arising out of the claims" she had already made.  As stated previously, the extent

8  of the claims Ms. Vogel had made at the time of the Stipulation was reimbursement for

9  memberships she purchased for others.  The only issue is whether the Stipulation covered

10  three memberships, or more than three.  But the Stipulation's terms did not release DYHC

11  from liability for all possible future claims, only those arising from Ms. Vogel's purchase

12  of memberships for others and those arising solely from Ms. Vogel's employment.

13  Therefore, the Stipulation, if valid, does not completely bar any of Ms. Vogel's claims

14  against DYHC in the current lawsuit, with the exception of COA7, alleging federal wage

15  and hour law violations.

16            **c.**      **Undue Influence**

17        Ms. Vogel also contends that the Stipulation was the "product of Defendant's

18  undue influence" and is therefore "voidable."  (Pls.' Opp'n to MSJ 1 at 9-10.)  In other

19  words, even though Ms. Vogel testifies that she initiated the settlement, she argues that, to

20  the extent the Stipulation she signed is held to preclude claims beyond reimbursement for

21  three memberships, it is the result of DYHC's undue influence.  (*Id.*)  DYHC argues that

22  Ms. Vogel fails to show undue influence as defined by § 177 of the Restatement (Second)

23  of Contracts, and that Ms. Vogel has waived any claim of undue influence by not timely

24  seeking rescission of the Stipulation and tendering the settlement money she received to

25  the Court.  (Reply to MSJ 1 at 9-11.)

26

27  [25] In addition, to the extent that Ms. Vogel's civil RICO claim arises from her employment

28  with DYHC, it would also be barred by the terms of the Stipulation.

1     Massachusetts recognizes the doctrine of undue influence to make a contract void

2 and its case law is substantially in accord with the Restatement (Second) of Contracts.

3 *Bruno v. Bruno*, 422 N.E.2d 1369, 1371 (Mass. 1981).  As defined in the Restatement,

4 "[u]ndue influence is unfair persuasion of a party who is under the domination of the

5 person exercising the persuasion or who, by virtue of the relation between them, is

6 justified in assuming that that person will not act in a manner inconsistent with his

7 welfare."  Restatement (Second) of Contracts § 177 (formerly § 319).  In Massachusetts,

8 "the elements necessary to prove undue influence [are] (1) A person who can be

9 influenced, (2) the fact of deception practiced or improper influence exerted, [and] (3)

10 submission to the overmastering effect of such unlawful conduct."  *In re The Bible Speaks*,

11 869 F.2d 628, 641 (1st Cir. 1989) (applying Massachusetts law) (quotations omitted).  "It

12 generally takes less to establish undue influence when a confidential relationship exists

13 between the parties."  *Id.* (quotation omitted).  Factors to consider in determining whether

14 a confidential relationship exists include:  (1) "close contact between the parties in the

15 context of their relationship," (2) "knowledge by the [dominant party] that the [submissive

16 party] trusted or depended upon him," and (3) "requests by the [submissive party] for the

17 [dominant party's] advice or help."  *Id.* at 641-42 (citations omitted).

18     In general,

19     [a]ny species of coercion, whether physical, mental or moral, which subverts
      the sound judgment and genuine desire of the individual, is enough to
20    constitute undue influence.  Its extent or degree is inconsequential so long as
      it is sufficient to substitute the dominating purpose of another for the free
21    expression of the wishes of the person [who gives].  Nonetheless, there must
      be a solid foundation of established facts upon which to rest an inference of
22    its existence.  And, the mere opportunity to exercise undue influence and the
      mere existence of a confidential relationship do not establish undue
23    influence.

24 *Id.* at 642 (quotations omitted).

25     In the instant case, issues of material fact exist as to whether Ms. Vogel was under

26 the undue influence of  DYHC when she signed the Stipulation.  In support of her

27 allegation of undue influence, Ms. Vogel provides the affidavit of Dr. Mann, who states

28 that Ms. Vogel was subject to "coercive persuasion" and "thought reform" by "Dahn."

1 (Pls.' Opp'n to MSJ 1, Mann Decl. ¶¶ 11, 12, 17-25.)  For example, Dr. Mann states that

2 "Dahn" used "sleep deprivation, reduced calorie protein diet, constant, excessive exercise

3 demands, stress position, fear of assault upon one's person, actual physical punishment,

4 and overwork" to dominate Ms. Vogel.  (*Id.* ¶ 22.)  She further states that "Dahn lowered

5 [Ms. Vogel's] ability to resist the subordination of [her] will" and that "Dahn" used "guilt,

6 shame, innate respect for authority, and the lifelong socialization process to bind [Ms.

7 Vogel] to the money making pursuits of the organization."  (*Id.*)  Dr. Mann explains that,

8 as a result of the practices of "Dahn," Ms. Vogel was "incapable of making rational and

9 informed decisions."  (*Id.* ¶ 25.)  Dr. Mann opines that Ms. Vogel was still under the

10 influence of "Dahn" when she signed the Stipulation, and that "[m]erely physically exiting

11 a high demand group on a certain date does not mean the undue influence promulgated by

12 this group has 'worn off.'"  (*Id.* ¶ 31.)

13 　　　DYHC argues without evidentiary support that Ms. Vogel's statement in the FAC

14 that she "was able to break the psychological manipulation and indoctrination sufficiently

15 to leave Dahn in September of 2007" is enough to foreclose Ms. Vogel's claim of undue

16 influence.  (MSJ 1 at 8; *see also* FAC ¶ 54aa.)  But, through the affidavit of Dr. Mann, Ms.

17 Vogel has done enough to raise a genuine issue as to whether DYHC exerted undue

18 influence on her, and how long that influence lasted.  The validity of the Stipulation can

19 therefore not be decided on summary judgment.[26]  As a result, the Court denies DYHC's

20 Motion for Summary Judgment as to Ms. Vogel, and the determination whether the

21

22 ───────────

23 [26] As an alternative grounds for summary judgment, DYHC cites case law to support the
proposition that a party seeking to rescind a contract must do so within a reasonable time of
24 knowing the grounds for rescission, and Ms. Vogel has failed to rescind the Stipulation.
(Reply to MSJ 1 at 10-11.)  However, although Ms. Vogel's briefing makes clear her
25 awareness of the potential grounds for rescission (her undue influence allegation), she states
that she believes that the Stipulation only settled her claims for reimbursement of three
26 memberships.  (Pls.' Opp'n to MSJ 1 at 10.)  A request for rescission would reasonably be
triggered by Ms. Vogel's discovery that the Stipulation settled claims beyond those that Ms.
27 Vogel currently believes it settled.
28

1   Stipulation is effective to bar any of Ms. Vogel's claims against DYHC must be made by a

2   fact finder.

3               **2.      Ms. Simeral's Stipulation for Settlement**

4           Plaintiff Ms. Simeral is a resident of New Hampshire.  (FAC ¶ 25.)  Ms. Simeral

5   began her employment as a yoga instructor with DYHC in 2005, also at the Newton Dahn

6   Center in Massachusetts.  (DSOF ¶ 27; FAC ¶ 54w.)  Ms. Simeral contends that DYHC

7   "Masters" coerced her to give loans to others to buy memberships and to give cash directly

8   to the Boston-area yoga centers to help make the monthly "Vision" sales targets.  (Pls.'

9   Opp'n to MSJ 1, Simeral Decl. ¶¶ 13-15.)  Ms. Simeral eventually became the director of

10  the yoga center in Andover, Massachusetts, and was subsequently moved to Copley Center

11  in downtown Boston.  (*Id.* ¶¶ 14-15.)  Ms. Simeral alleges she felt "very stressed" trying to

12  make the monthly "Vision" sales targets, and spent over $87,000 of her own money to try

13  to meet those targets under coercion from DYHC "Masters."  (*Id.* ¶¶ 15, 17.)  In January

14  2007, two of Ms. Simeral's cousins physically removed her from the Copley Center yoga

15  center, "went to [her] apartment and packed [her] things into a truck and drove away."  (*Id.*

16  ¶ 18.)  A few days later, Ms. Simeral requested a refund from a DYHC "Master" of the

17  money she had paid to help her center meet the "Vision" targets from October to

18  December 2006, totalling around $21,000.  (DSOF & PSOF ¶ 30; Simeral Decl. ¶ 19.)

19  DYHC agreed to reimburse Ms. Simeral, and required her to sign a Stipulation for

20  Settlement as a condition of reimbursement.  (DSOF & PSOF ¶¶ 31-33.)  Ms. Simeral

21  signed the Stipulation on March 10, 2007, and negotiated DYHC's check several days

22  later.  (DSOF & PSOF ¶ 34.)

23          The Stipulation provides, in relevant part:

24          1. [DYHC] shall pay to Heather Simeral the total sum of $21,867.00 in full
            settlement and compromise of her complaints and <u>in release and discharge of</u>
25          <u>any and all claims and causes of action made by her</u>, and <u>in release and</u>
            <u>discharge of any and all claims and causes of action arising out of the events</u>
26          <u>or incidents at the Dahn Center at 551 Boylston St., Boston, Massachusetts.</u>

27          2. Heather Simeral . . . [agrees] that such payment shall <u>fully and forever</u>
            <u>discharge and release all claims and causes of action, whether now known or</u>

28

1

<u>unknown, which she has against [DYHC] and any and all of its agents or
employees arising out of the complaints made by Heather Simeral.</u>

2

3

8.  The payment amount represents membership fees that Heather Simeral
claims to have made on behalf of other people as shown in the attached
Schedule A.  Heather Simeral assumes all responsibility and promises that
those persons listed in Schedule A shall not be making claims for refunds
from [DYHC].  In the event of any of those persons claim [*sic*] a refund for
the membership type listed, then Heather Simeral shall indemnify [DYHC]
and make good any refunds to those people.

4

5

6

(MSJ 1, Kim Decl., Ex. G (emphasis added).)

7

8

The Court again applies Massachusetts law to interpret the Stipulation and assess its

9

validity.  While Ms. Simeral is currently a resident of New Hampshire, Massachusetts still

10

has the most significant relationship to the transaction and the parties with respect to the

11

Stipulation, because the Stipulation arises from DYHC's operation of yoga centers in

12

Massachusetts and employment of Ms. Simeral in Massachusetts.

13

The Simeral Stipulation uses nearly verbatim language to the Vogel Stipulation.

14

The only noteworthy difference is in ¶ 2, in which Ms. Vogel released "any and all claims

15

and causes of action arising out of [her] employment with [DYHC]," and Ms. Simeral

16

released "any and all claims and causes of action arising out of the events or incidents at

17

the Dahn Center at 551 Boylston St., Boston, Massachusetts."  By is plain language, Ms.

18

Simeral's release is narrower in an employment context; the Stipulation releases only

19

claims arising from her work at a specific yoga center, and she alleges that she worked at

20

several.  But the release also purports to cover non-employment activities at the listed

21

center, and is thus broader in the non-employment context than that of Ms. Vogel.

22

Because the Stipulation leaves room for Ms. Simeral to raise employment-related claims

23

with respect to yoga centers other than the one listed, the Stipulation does not serve to

24

completely bar any of Ms. Simeral's present claims against DYHC as a matter of law.  The

25

effect of the release will be determined when and if Ms. Simeral brings more fact-specific

26

claims against DYHC.

27

Furthermore, as in Ms. Vogel's case, Plaintiffs have provided enough evidence

28

though the affidavit of Dr. Mann to raise a genuine issue as to whether DYHC exerted

1   undue influence on Ms. Simeral to sign the Stipulation.  The validity of the Simeral

2   Stipulation can therefore not be decided on summary judgment.  A fact finder must decide

3   whether the Stipulation is effective to bar any of Ms. Simeral's present claims against

4   DYHC.

5              **3.     Ms. Gargosh's Stipulation for Settlement**

6         In support of its Motion for Summary Judgment on the claims of Plaintiff Ms.

7   Gargosh, DYHC provides a copy of the purported Stipulation for Settlement between

8   DYHC and Ms. Gargosh, which differs significantly from those of Ms. Vogel and Ms.

9   Simeral.  (MSJ 1, Kim Decl., Ex. D.)  Moreover, the copy provided by DYHC is not

10  signed by Ms. Gargosh.  (*Id.*)  DYHC also provides the Declaration of Nyun Haeng Kim,

11  its Accounting Manager, who avers:

12        Ms. Gargosh agreed to the settlement (the "Gargosh Settlement").  As a
          condition of the Gargosh Settlement, Dahn also required Ms. Gargosh to
13        sign a written agreement memorializing the terms of the Settlement, which
          was entitled "Stipulation for Settlement" (the "Gargosh Settlement
14        Agreement").  A true and correct copy of the Gargosh Settlement
          Agreement, which was prepared by Dahn, is attached hereto as Exhibit "D".
15        One or more Dahn employees witnessed Ms. Gargosh sign the Gargosh
          Settlement Agreement.
16
17  (MSJ 1, Kim Decl. ¶ 28.)  In her Response, Ms. Gargosh challenges the authenticity of the

18  Stipulation provided by DYHC, stating:

19        I picked up the $4,500 refund check and cashed it on December 2, 2008.
          Although I recall signing some type of form document when I picked up the
20        check, I do not recognize the Stipulation for Settlement that Defendants say I
          signed.  It certainly does not look like the "standard refund and release form"
21        mentioned in John Lee's letter to me.  I do not believe I signed it.

22  (Pls.' Opp'n to MSJ 1, Gargosh Decl. ¶ 25.)  In its Reply, DYHC provides a different copy

23  of the Stipulation that contains the purported signature of Ms. Gargosh.[27]  (MSJ 1, Kim

24  Decl., Ex. A.)

25

26  _____

27  [27] The signature of the DYHC representative, In Lee, is different between the copy of the
    Stipulation provided in the Motion for Summary Judgment and that provided in the Reply.
28  (*Compare* MSJ 1, Kim Decl., Ex. D *with* Reply to MSJ 1, Kim Decl., Ex. A.)

1     "It is well settled that only admissible evidence may be considered by the trial court

2  in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc.*, 854

3  F.2d 1179, 1181 (9th Cir. 1988) (citing Fed. R. Civ. P. 56(e); other citations omitted).

4  Rule 901(a) of the Federal Rules of Evidence provides that authentication is "a condition

5  precedent to admissibility," and this condition is "satisfied by evidence sufficient to

6  support a finding that the matter in question is what its proponent claims."  Fed. R. Evid.

7  901(a).  "Once the trial judge determines that there is prima facie evidence of genuineness,

8  the evidence is admitted, and the trier of fact makes its own determination of the

9  evidence's authenticity and weight."  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 n.6

10  (9th Cir. 2002).

11     "In a summary judgment motion, documents authenticated through personal

12  knowledge must be 'attached to an affidavit that meets the requirements of [Fed. R. Civ.

13  P.] 56(e) and the affiant must be a person through whom the exhibits could be admitted

14  into evidence.'"  *Id.* at 773-74 (quoting *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920,

15  925 (9th Cir. 1987)).  "However, a proper foundation need not be established through

16  personal knowledge but can rest on any manner permitted by Federal Rule of Evidence

17  901(b) or 902."  *Id.* at 774 (citing Fed. R. Evid. 901(b) (providing ten approaches to

18  authentication); Fed. R. Evid. 902 (noting that self-authenticating documents need no

19  extrinsic foundation)).

20     Because Ms. Gargosh raises a question as to the authenticity of the Stipulation,

21  DYHC must authenticate the copy of the Stipulation it provided by an affidavit from a

22  "person through whom the exhibits could be admitted into evidence."  See *id.* at 773 n.6.

23  "'A document can be authenticated [under Rule 901(b)(1)] by a witness who wrote it,

24  signed it, used it, or saw others do so.'"  *Id.* at n.8 (quoting 31 Wright & Gold, Fed.

25  Practice & Procedure: Evidence § 7106, 43 (2000)).  In the affidavit provided by DYHC to

26  authenticate the Stipulation, Ms. Kim never states that she has personal knowledge that

27  Ms. Gargosh signed the copy of the Stipulation provided by DYHC.  Ms. Kim states only

28  that "[o]ne or more Dahn employees witnessed Ms. Gargosh sign the Gargosh Settlement

1    Agreement." (MSJ 1, Kim Decl. ¶ 28.)  Ms. Kim does not state that she wrote the

2    Stipulation, signed it, used it, or saw others do so.  Ms. Kim therefore does not provide

3    prima facie evidence based on her personal knowledge to authenticate the Stipulation

4    under Rule 901(b)(1).  The Court likewise finds no other evidence provided by DYHC to

5    authenticate the copy of the Stipulation it provided in its briefing.  Because Ms. Gargosh

6    avers that she does not recognize or recall signing the Stipulation provided by DYHC, and

7    the Court must regard Ms. Gargosh's statements as true absent proper authentication

8    evidence from DYHC, the Court must deny DYHC's Motion for Summary Judgment as to

9    Ms. Gargosh.

10            **IT IS THEREFORE ORDERED** granting in part and denying in part the Motions

11    to Dismiss filed by Defendants Mr. Lee (Doc. 38), Vortex (Doc. 39), DYHC (Doc. 41),

12    CGI (Doc. 51), Mrs. Lee (Doc. 61), Tao (Doc. 65), and BR/Oasis (Doc. 67).  Plaintiffs

13    have failed to adequately plead claims 1-8 (COAs 1-8), and these claims are dismissed

14    without prejudice.  Plaintiffs are directed to file any amendments to their pleading within

15    30 calendar days of the date of this Order.  Defendants' Motions to Dismiss are denied

16    with respect to Plaintiffs' claims 9 and 10 (COAs 9-10), and with respect to Defendants'

17    request for relief under Rule 12(f).

18            **IT IS FURTHER ORDERED** denying Defendant DYHC's two Motions for

19    Summary Judgment (Docs. 18 & 102) and the Motion for Summary Judgment of

20    Defendants Vortex, Tao, BR and Oasis (Doc. 111).

21            **IT IS FURTHER ORDERED** requiring any party that desires to file more than

22    one Motion for Summary Judgment to obtain leave of Court beforehand.  The Court notes

23    that Defendant DYHC (comprising Dahn Yoga & Health Centers, Inc. and Mago Earth,

24    Inc.) has already filed two Motions for Summary Judgment and Defendants Vortex, Tao,

25

26

27

28

1   BR and Oasis have already filed one Motion for Summary Judgment, so these parties may

2   not file additional Motions for Summary Judgment without leave of Court.

3

4        DATED this 3rd day of November, 2009.

5

6

7

8   _____

                    Susan R. Bolton
9               United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28